2012 UT 11

B.R., a minor child, and C.R., a minor child, through their conservator William M. JEFFS, Plaintiffs and Appellants,

v.

Trina WEST, Hugo Rodier, Pioneer Comprehensive Medical Clinic, and John Does I–X, Defendants and Appellees.

No. 20110207.

Supreme Court of Utah.

Feb. 28, 2012.

Allen K. Young, Tyler S. Young, Provo, Jonah Orlofsky, Chicago, IL, for appellants.

Stephen W. Owens, J. Kevin Murphy, Vaun B. Hall, Salt Lake City, Michael K. McKell, Paul McArthur, Provo, for appellees.

Tawni J. Anderson, for amici Utah Medical Association, Utah Psychiatric Association, Utah Hospitals and Health Systems Association, and American Medical Association.

Justice LEE, opinion of the Court:

¶ 1 In this case we are asked to determine whether a physician owes nonpatients a duty to exercise reasonable care in the affirmative act of prescribing medications that pose a risk of injury to third parties. We uphold such a duty, while clarifying the nature of the legal analysis relevant to duty in tort, the factors relevant to its evaluation, and its relation to matters of breach and proximate cause.

I

¶ 2 According to the allegations of the complaint, which we accept as true for purposes of our analysis, David Ragsdale received medical treatment in 2007 from Trina West, a nurse practitioner at Pioneer Comprehensive Medical Clinic in Draper, Utah.

Nurse West prescribed Ragsdale at least six medications, including Concerta, Valium, Doxepin, Paxil, pregnenolone, and testosterone. In January 2008, with all of these drugs in his system, Mr. Ragsdale shot and killed his wife, Kristy Ragsdale. Mr. Ragsdale subsequently pled guilty to aggravated murder.

¶ 3 The Ragsdales' young children, who were left parentless, filed suit through their conservator against Nurse West, her consulting physician Dr. Hugo Rodier, and the medical clinic. Plaintiffs alleged negligence in the prescription of the medications that caused Mr. Ragsdale's violent outburst and his wife's death.

¶ 4 Defendants filed a motion to dismiss under rule 12(b)(6) of the Utah Rules of Civil Procedure. The district court granted the motion, concluding that West owed no duty of care to plaintiffs because "no patient-health care provider relationship existed, at the time of the underlying events, between the plaintiffs … and the defendants." The court further reasoned that "the non-patient plaintiffs may [not] step into David Ragsdale's shoes to pursue a malpractice lawsuit against the defendants." Plaintiffs filed this appeal, contending that the district court incorrectly concluded that defendants did not owe a duty of care to the nonpatient plaintiffs. We agree and reverse.[1]

## II

¶ 5 As every first-year law student learns, duty is one of four essential elements of a cause of action in tort.[2] In negligence cases, a duty is " 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.' " [3] The question in this case is whether healthcare providers have a legal obligation to nonpatients to exercise reasonable care in prescribing medications that pose a risk of injury to third parties. Our cases have identified several factors relevant to determining whether a defendant owes a duty to a plaintiff, including: (1) whether the defendant's allegedly tortious conduct consists of an affirmative act or merely an omission, e.g., Webb v. Univ. of Utah, 2005 UT 80, ¶ 10, 125 P.3d 906; (2) the legal relationship of the parties, id.; (3) the foreseeability or likelihood of injury, e.g., AMS Salt Indus., Inc. v. Magnesium Corp. of Am., 942 P.2d 315, 321 (Utah 1997); (4) "public policy as to which party can best bear the loss occasioned by the injury," Normandeau v. Hanson Equip., Inc., 2009 UT 44, ¶ 19, 215 P.3d 152; and (5) "other general policy considerations," id. Not every factor is created equal, however. As we explain below, some factors are featured heavily in certain types of cases, while other factors play a less important, or different, role. The parties in this case focus heavily on the first two factors. We address those factors in Part A and explain that the legal-relationship factor is typically a "plus" factor—used to impose a duty where one would otherwise not exist, such as where the act complained of is merely an omission. In Part B, we discuss the final three factors and explain that these factors are typically "minus" factors—used to eliminate a duty that would otherwise exist. Applying these factors, we conclude that defendants do owe a duty to plaintiffs in this case.

## A

¶ 6 A central point of the parties' disagreement in this case is whether a healthcare provider's duty requires the existence of a "special legal relationship." Defendants contend that healthcare providers owe no duty

---

1. Appellees also claim on appeal that Mr. Ragsdale's guilty plea in his criminal case has a collateral estoppel effect that precludes appellants from litigating the causation issue—whether the prescribed medication caused Mr. Ragsdale's violent conduct. The district court refused to reach this issue, yet hypothesized what it would do "if [it] were to reach that alternative motion." We decline to offer an advisory opinion on the district court's hypothetical ruling.

2. To assert a successful negligence claim, a plaintiff must establish that (1) defendant owed plaintiff a duty of care, (2) defendant breached that duty, and that (3) the breach was the proximate cause of (4) plaintiff's injuries or damages. Webb v. Univ. of Utah, 2005 UT 80, ¶ 9, 125 P.3d 906.

3. AMS Salt Indus., Inc. v. Magnesium Corp. of Am., 942 P.2d 315, 321 (Utah 1997) (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 53, at 356 (5th ed. 1984)).

to a nonpatient who has been injured by a patient unless the patient has a special relationship with the provider—such as where the provider has custody or control of the patient, or where the provider is on notice that the patient is uniquely dangerous to specified third parties. Plaintiffs, for their part, insist that a special relationship is required "only where a claim is based on an omission or a failure to act." According to plaintiffs, the "most critical fact in this case is that Defendants' negligence consists of affirmative conduct," because affirmative acts are typically associated with a duty of care.

¶ 7 We side with the plaintiffs. The long-recognized distinction between acts and omissions-or misfeasance and nonfeasance—makes a critical difference and is perhaps the most fundamental factor courts consider when evaluating duty.[4] Acts of misfeasance, or "active misconduct working positive injury to others," typically carry a duty of care.[5] Nonfeasance—"passive inaction, a failure to take positive steps to benefit others, or to protect them from harm not created by any wrongful act of the defendant"—by contrast, generally implicates a duty only in cases of special legal relationships.[6] The first two duty factors, then, are interrelated.

■ ¶ 8 Special relationships "arise when one assumes responsibility for another's safety or deprives another of his or her normal opportunities for self-protection." *Webb*, 2005 UT 80, ¶ 10, 125 P.3d 906 (internal quotation marks omitted). Traditional examples include "common carrier to its passenger, innkeeper and guest, landowner and invitees to his land, and one who takes custody of another." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 314A (1965)).

■ ¶ 9 We previously clarified the relationship between the nonfeasance and special-relationship factors in *Webb*, 2005 UT 80, 125 P.3d 906. There we explained:

> [T]he distinction between acts and omissions is central to assessing whether a duty is owed [to] a plaintiff. In almost every instance, an act carries with it a potential duty and resulting legal accountability for that act. By contrast, an omission or failure to act can generally give rise to liability only in the presence of some external circumstance—a special relationship.

*Id.* ¶ 10 (citations omitted). A special legal relationship between the parties thus acts as a duty-enhancing, "plus" factor. Even in nonfeasance cases, where a bystander typically would owe no duty to prevent harm, a special legal relationship gives rise to such a duty.[7]

■ ¶ 10 *Webb* itself was a suit against a government entity which, for policy reasons, is a rare instance where an affirmative act does not presumptively give rise to a duty. *Id.* ¶ 11. Under *Webb*, a plaintiff must demonstrate a special relationship with a government actor even if the injury arises from an

4. *See* Francis H. Bohlen, *The Moral Duty to Aid Others as a Basis of Tort Liability*, 56 U. PA. L. REV. 217, 219 (1908) (describing the act/omission distinction as "deeply rooted in the common law").

5. *Id.*

6. *Id.*

7. *See Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶¶ 15–18, 143 P.3d 283 (explaining that a legal relationship between the parties acts as a plus factor, imposing a "duty to communicate [important] information" that would not exist absent the relationship); *Dwiggins v. Morgan Jewelers*, 811 P.2d 182, 183 (Utah 1991) (using the legal relationship of the parties as a plus factor to impose a heightened duty on shopkeepers to protect customers from criminal acts of other customers); *see also Griesi v. Atl. Gen. Hosp. Corp.*, 360 Md. 1, 756 A.2d 548, 554 (2000) (requiring legal relationship of "privity or its equivalent" to impose a duty to communicate in negligent misrepresentation cases); *Vermes v. Am. Dist. Tel. Co.*, 312 Minn. 33, 251 N.W.2d 101, 103–04 (1977) (explaining that a contractual relationship both imposes heightened duties of care and "place[s] boundaries" on the parties' duties to each other); *Independent–Eastern Torpedo Co. v. Price*, 208 Okla. 633, 258 P.2d 189, 201–02 (1953) (explaining that duty for affirmative acts exists "without regard to the legal relationship of the parties," but that a legal relationship between the parties may support a negligent misrepresentation claim by creating a heightened duty to give "correct information" (internal quotation marks omitted)); *Volpe v. Fleet Nat'l Bank*, 710 A.2d 661, 663–64 (R.I.1998) (explaining that the legal relationship between banks and customers imposes a heightened duty of care upon banks to prevent forgeries of customer's checks).

affirmative act, rather than an omission.[8] Thus, *Webb* held that, because no special relationship existed, the University of Utah did not owe a duty to a student who allegedly was directed by a university employee to walk on an icy sidewalk. *Id.* ¶¶ 3, 16, 27. Outside the government context, however, a special relationship is not typically required to sustain a duty of care to those who could foreseeably be injured by the defendant's affirmative acts. *Id.* ¶ 10.[9]

¶ 11 The cases cited by defendants are not to the contrary. They require a special relationship only as to nonfeasance or acts of government defendants. *See Rollins v. Petersen,* 813 P.2d 1156 (Utah 1991); *Higgins v. Salt Lake Cnty.,* 855 P.2d 231 (Utah 1993); *Wilson v. Valley Mental Health,* 969 P.2d 416 (Utah 1998). *Rollins,* for example, was a straightforward nonfeasance case: Plaintiff alleged negligence in a secure mental health facility's failure to prevent a patient from causing a car accident—"in allowing [the patient] to walk away from the facility, and in not adequately instituting its own AWOL procedures to recover him." *Rollins,* 813 P.2d at 1158. In refusing to find a duty of care, the court held that no special relationship existed between the hospital and the patient, and therefore the hospital owed no duty to the plaintiff to protect against harm caused by the patient. *Id.* at 1162.

¶ 12 Notably, in *Rollins* the plaintiff did not allege any affirmative misconduct by the hospital—just that the hospital had failed to prevent the patient from engaging in harmful conduct. Thus, the court analyzed duty under the *Restatement (Second) of Torts* sections 314–20, entitled "Duties of Affirmative Action." *Rollins,* 813 P.2d at 1159. Those sections are a restatement of and elaboration on the principle we discussed in *Webb,* 2005 UT 80, ¶ 10, 125 P.3d 906, that "an omission or failure to act can generally give rise to liability only in the presence of some external circumstance—a special relationship." [10]

¶ 13 *Higgins* is similar. When a mentally ill hospital outpatient stabbed a young girl, her parents alleged that the hospital owed a duty to the plaintiff to "control and/or to treat" the patient to prevent the patient from engaging in violent conduct. 855 P.2d at 234. The court again applied section 315 of the *Restatement (Second),* explaining that a person has "no duty to control the conduct of others except in certain circumstances, as where a special relationship exists." *Id.* at 235, 236 (internal quotation marks omitted). As in *Rollins,* the plaintiff did not allege that the hospital's affirmative acts caused the patient's violent attack; the plaintiff alleged merely that the hospital failed to prevent the patient's independent actions.

8. *Webb,* 2005 UT 80, ¶¶ 11, 16, 125 P.3d 906 ("[G]overnmental actors [are] answerable in tort [only] when their negligent conduct causes injury to persons who stand so far apart from the general public that we can describe them as having a special relationship to the governmental actor. . . . [G]overnmental actors are not accountable for their affirmative acts unless a special relationship is present."); *see also Day v. State ex rel. Utah Dep't of Pub. Safety,* 1999 UT 46, ¶ 13, 980 P.2d 1171 (noting four circumstances in which a special relationship may arise: "(1) [when] a statute intend[s] to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; (2) when a government agent undertakes specific action to protect a person or property; (3) [when] governmental actions . . . reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff").

9. *See also* Restatement (Second) of Torts § 302 cmt. a (1965) ("In general, anyone who does an

affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act. The duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relation between the actor and the other which gives rise to the duty."); Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 7 cmt. a (2010) ("[A]ctors engaging in conduct that creates risks to others have a duty to exercise reasonable care to avoid causing physical harm.").

10. *See also* Restatement (Second) of Torts § 315 ("There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection.").

¶ 14 *Wilson* also involved an omission rather than an affirmative causal act. A mental health facility treated and released a patient, who later that same day strangled his wife and attempted to strangle their child. 969 P.2d at 417. The plaintiffs alleged that the healthcare provider owed them a duty to protect against a patient's violent conduct by warning them of the patient's dangerousness. *Id.* at 418. In *Wilson,* the court held that the special-relationship test was superseded by a Utah statute, which "define[d] the duty of a therapist in cases where it is alleged that a therapist had a duty to warn or take precautions to provide protection from the violent behavior of a client." *Id.* at 421.

¶ 15 Thus, *Rollins, Higgins,* and *Wilson* all stand for the proposition that a healthcare provider is not required to control its patients' independent conduct. They do not support defendants' view that a healthcare provider may—with immunity from liability to any nonpatient—negligently prescribe medication that affirmatively causes a patient to injure nonpatients.

¶ 16 The district court cited *Joseph v. McCann,* 2006 UT App 459, 147 P.3d 547, in support of its conclusion that a physician-patient relationship is a prerequisite to a negligence claim against a physician. But we do not read *Joseph* to establish such a rigid requirement. *Joseph* held that a physician did not owe a duty to a non-patient police officer when the physician was hired by the city to evaluate the officer's fitness for employment. *Id.* ¶¶ 12–13. The suit in *Joseph* was a malpractice action by the police officer filed when his city-employer found him unfit for work on the basis of the physician's evaluation. *Id.* ¶ 5. Because the physician never *treated* the officer, but instead conducted a psychiatric evaluation on behalf of the employer, no physician-patient relationship was created and the "malpractice lawsuit fail[ed] as a matter of law." *Id.* ¶¶ 11, 13. The court's holding, however, did not establish a requirement of a physician-patient relationship in every negligence suit against a healthcare provider. Instead, *Joseph* simply represents a unique situation in which the harm alleged was not encompassed within any formulation of the duty owed.

¶ 17 The plaintiff in *Joseph* did not assert that the physician had a duty to exercise care in providing medical treatment. Rather, the officer claimed that the physician owed him a duty to exercise care in evaluating his suitability for his job for the purpose of giving a report to an employer. *Id.* ¶ 9. Thus, *Joseph* simply indicates that the type of harm the officer suffered—removal from the police force—did not come within the range of harms that the physician had a duty to avoid. That does not mean that the physician lacked a duty to avoid affirmatively causing physical injury to the officer. If the physician in *Joseph* had used a scalpel instead of a tongue depressor to facilitate a throat examination, presumably the duty would be as obvious as the ensuing injuries.

¶ 18 Plaintiffs' allegations of duty thus steer clear of the problems identified in our nonfeasance cases and in the court of appeals' decision in *Joseph.* This is not a case in which the healthcare provider is charged with failing to restrain Ragsdale or with failing to warn his family about his unstable condition. Rather, plaintiffs allege that defendants' affirmative acts of prescribing medication caused David Ragsdale to have a violent outburst and take his wife's life. And unlike in *Joseph,* plaintiffs are not purporting to step into the shoes of the party who retained the physician's services. Their claim is not a derivative one for harm to their father, but a personal one for their own injuries.

¶ 19 For these reasons, a special relationship or physician-patient relationship need not underlie the defendants' duty to the plaintiffs in this case. And as we explain below, the other duty factors do not justify eliminating defendants' duty to exercise care when engaging in the affirmative act of prescribing medication.

**B**

¶ 20 Defendants and their amici next ask us to create a rule—primarily on policy grounds—that healthcare providers owe no duty to anyone other than a patient. We find no basis for a rule excluding all healthcare providers from liability for carelessly

prescribing medications that affirmatively cause their patients to harm third parties. We instead hold that healthcare providers do owe such a duty. In explaining our reasons for doing so, we clarify the nature of the duty inquiry and of the remaining duty factors.

¶ 21 As a general rule, we all have a duty to exercise care when engaging in affirmative conduct that creates a risk of physical harm to others.[11] There are exceptions to the rule, however, in categories of cases implicating unique policy concerns that justify eliminating the duty of care for a class of defendants.[12] The remaining duty factors aid us in determining whether to carve out an exception to the general rule. These "minus" factors encompass the foreseeability or likelihood of injury, *e.g.*, *AMS Salt Indus.*, 942 P.2d at 321; "public policy as to which party can best bear the loss occasioned by the injury," *Normandeau*, 2009 UT 44, ¶ 19, 215 P.3d 152; and "other general policy considerations," *id.*

¶ 22 The parties in this case variously invoke each of these factors, seeking to shape them in ways that sustain their opposing positions. But many of their arguments reflect a misunderstanding of the role of duty in tort analysis, sometimes conflating duty with breach and proximate cause. Under a proper understanding of the duty factors, we affirm the existence of a duty on the part of healthcare providers to exercise reasonable care in prescribing medications that pose a risk of injury to third parties.

¶ 23 Our most basic concern with the parties' arguments is the failure to address duty at a categorical level. Plaintiffs assert (without citation) that we have "repeatedly held that whether a duty exists must be decided on a case-by-case basis." They further claim that this court has "long emphasized that duty determinations should be fact specific." This is not a proper approach to the duty analysis. Duty must be determined as a matter of law and on a categorical basis for a given class of tort claims.[13] Duty de-

---

**11.** RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 7(a) ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm."); *id.* 7 cmt. a ("[A]ctors engaging in conduct that creates risks to others have a duty to exercise reasonable care to avoid causing physical harm."); RESTATEMENT (SECOND) OF TORTS § 302 cmt. a ("In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act. The duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relation between the actor and the other which gives rise to the duty."); *see also, e.g., Turpen v. Granieri*, 133 Idaho 244, 985 P.2d 669, 672 (1999) ("Every person, in the conduct of his business, has a duty to exercise ordinary care to prevent unreasonable, foreseeable risks of harm to others." (internal quotation marks omitted)); *Hart v. Ivey*, 332 N.C. 299, 420 S.E.2d 174, 178 (1992) ("[T]he law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm, and calls a violation of that duty negligence." (internal quotation marks omitted)); *Independent–Eastern Torpedo Co.*, 258 P.2d at 203 ("[I]t is the duty of every man to use his own property so as not to injure the person or property of others."); *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99, 103 (1928) (Andrews, J., dissenting) ("Every one owes to the world at large the duty of refraining from those

acts that may unreasonably threaten the safety of others.").

**12.** RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 7(b) ("In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification."); *see also, e.g., Webb*, 2005 UT 80, ¶ 11, 125 P.3d 906 (explaining that as "a matter of public policy," government actors as a class are excused from owing a duty of care to the general public); *Ontiveros v. Borak*, 136 Ariz. 500, 667 P.2d 200, 212–13 (1983) (acknowledging that "in some situations, the public interest, constitutional considerations, or both, require special rules to protect certain businesses, professions or occupations from the ordinary theories of tort liability," but nevertheless abolishing the common law doctrine of tavern owner nonliability for acts of intoxicated customers).

**13.** *See, e.g., Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 20, 215 P.3d 152 (explaining the distinction between categorical foreseeability and case-specific foreseeability); *Yazd*, 2006 UT 47, ¶¶ 21, 26, 143 P.3d 283 (analyzing duty categorically for all suits "brought by a home buyer" against a "builder-contractor"); *see also* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 7 cmt. a (explaining that courts use duty "to apply general categorical rules withholding liability" in some classes of cases).

terminations should be articulated in "relatively clear, categorical, bright-line rules of law applicable to a general class of cases."[14] The duty factors are thus analyzed at a broad, categorical level for a class of defendants. In this case, for example, the duty question does not turn on the specific combination of pharmaceuticals that Nurse West prescribed or the particular injury that it allegedly caused. Rather, the duty analysis considers healthcare providers as a class, negligent prescription of medication in general, and the full range of injuries that could result in this class of cases. Thus, Nurse West would owe no duty to appellants only if there were no duty for the whole class of healthcare providers in these general circumstances.

### 1

¶ 24 Defendants challenge the imposition of a duty here on the basis of a lack of foreseeability of injury. But their arguments conflate the kind of foreseeability relevant to the duty analysis with the foreseeability inquiries significant to matters of breach and proximate cause. Defendants concede, for example, that *some* negligent prescription cases pose a highly foreseeable danger to nonpatients, such as those involving the prescription of powerful sedatives to a professional truck driver. Yet they still insist that this "case involves highly complex and incompletely understood possible interactions of pharmacology, general human behavior, personality traits, and troubled marital relationships," and thus that there should be no duty here because plaintiffs' injury was not foreseeable to defendants. This is a confusing infusion of the kind of foreseeability relevant to breach or proximate cause into the duty analysis.

¶ 25 This conflation is perhaps understandable. Some variation of the notion of foreseeability is a factor in three of four elements of a tort: duty, breach, and proximate cause.[15] Yet the terminology is confusing, as the term has different connotations as to each of the different tort elements to which it is applied. An essential difference among the elements is that duty is a question of law determined on a categorical basis, while breach and proximate cause are questions for the fact finder determined on a case-specific basis.[16] This means that foreseeability in duty analysis is evaluated at a broad, categorical level. In duty analysis, foreseeability does not question "the specifics of the alleged tortious conduct" such as "the specific mechanism of the harm." *Normandeau*, 2009 UT 44, ¶ 20, 215 P.3d 152 (internal quotation marks omitted). It instead relates to "the general relationship between the alleged tortfeasor and the victim" and "the general foreseeability" of harm. *Id.* (internal quotation marks omitted).

¶ 26 Thus, defendants' foreseeability argument would be appropriately lodged as a breach or proximate cause argument. Whether—in this specific case—the drug interactions and psychological considerations at stake would lead a reasonable physician to take additional precautions because she could foresee that Mr. Ragsdale might become violent or dangerous is a question of breach. And whether the precise mixture of drugs did foreseeably cause Mr. Ragsdale's outburst is a question of proximate cause, as is whether Mr. Ragsdale's criminal conduct supersedes Nurse West's conduct as the proximate cause of Ms. Ragsdale's death. As we said in *Normandeau*, these questions about the foreseeability of the specific mechanism of injury fit within proximate cause, not duty. And those issues are not before us on this appeal, which deals only with the question of duty (the basis for the dismissal of plaintiffs' claims).

¶ 27 The appropriate foreseeability question for duty analysis is whether a category of cases includes individual cases in which

14. RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 7 cmt. a.

15. *See generally* Benjamin C. Zipursky, *Foreseeability in Breach, Duty, and Proximate Cause*, 44 WAKE FOREST L.REV. 1247 (2009).

16. RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 7 cmt. a ("When liability depends on factors specific to an individual case, the appropriate rubric is [proximate cause]. On the other hand, when liability depends on factors applicable to categories of actors or patterns of conduct, the appropriate rubric is duty.").

the likelihood of some type of harm is sufficiently high that a reasonable person could anticipate a general risk of injury to others. So stated, this factor weighs in favor of upholding a duty in this case. The relevant category of cases consists of healthcare providers negligently prescribing medications to patients who then injure third parties. And the foreseeability question is whether there are circumstances within that category in which a healthcare provider could foresee injury. We think so.

¶ 28 Pharmaceuticals span a scale of foreseeable risk, with innocuous drugs at the unforeseeable end and powerful narcotics at the other. Some negligent prescription cases may very well involve little foreseeable risk of injury: Imagine a patient that has a rare violent reaction to ibuprofen. Yet other cases may involve highly foreseeable risks, as where a physician mistakenly prescribes a high dose of a potent narcotic to an active airline pilot instead of the mild antibiotic the pilot needed. Because the class of cases includes some in which a risk of injury to third parties is reasonably foreseeable (as even defendants concede), the foreseeability factor weighs in favor of imposing a duty on healthcare providers to exercise care in prescribing medications so as to refrain from affirmatively causing injury to nonpatients. Whether in a particular case a prescription creates a risk of sufficient foreseeability that the physician should have exercised greater care to guard against injury is a question of breach. And whether the precise causal mechanism of a plaintiff's injuries was a foreseeable result of a defendant's prescriptions is a question of proximate cause. Both of those questions are case-specific and fact-intensive, and they are not before us on this appeal.

2

¶ 29 On the next factor, plaintiffs insist that physicians typically have financial resources that put them in a position to "bear the loss occasioned by the injury." *Normandeau*, 2009 UT 44, ¶ 19, 215 P.3d 152. Their argument, however, betrays a misperception of the nature of this factor. The parties' relative ability to "bear the loss" has little or nothing to do with the depth of their pockets.

¶ 30 Instead, this factor considers whether the defendant is best situated to take reasonable precautions to avoid injury.[17] Typically, this factor would cut against the imposition of a duty where a victim or some other third party is in a superior position of knowledge or control to avoid the loss in question.[18] In such circumstances, the defendant is not in a position to bear the loss, not because his pockets are shallow, but because he lacks the capacity that others have to avoid injury by taking reasonable precautions.

¶ 31 No such argument can be made here. Physicians—not third parties—are in a position to exercise ordinary care in prescribing medications so that patients do not pose an unreasonable risk of injury to others.

---

17. *See, e.g., Holtz v. J.J.B. Hilliard W.L. Lyons, Inc.*, 185 F.3d 732, 743 (7th Cir.1999) (reasoning that "duties should rest upon" the party in the best position to prevent the injury at the lowest cost); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Riggs Nat'l Bank of Wash., D.C.*, 5 F.3d 554, 557 (D.C.Cir.1993) (Silberman, J., concurring) (explaining that placing liability on the party in the best position to prevent injury at the lowest cost "increases the incentive for that party to adopt preventive measures").

18. *See, e.g., Smith v. Frandsen*, 2004 UT 55, ¶ 21, 94 P.3d 919 ("Where a developer conveys property to a residential contractor, the knowledge and expertise of the builder, and the independent duties owed thereby, interrupt certain obligations running from the initial developer to subsequent purchasers."); *Nelson v. United States*, 639 F.2d 469, 478 (9th Cir.1980) (explaining that the "de-cision to place liability on one group of potential defendants stems from the recognition that, because of greater knowledge about or ability to reduce safety risks, the placement of liability on this group will keep the number and costs of accidents, both in economic and human terms, at a minimum," but refusing to excuse private-contractor defendants from liability because "the Government was [not] in a better position than the contractor either to anticipate dangers to workmen, to foresee and evaluate the best methods of protection, or to implement and enforce compliance with appropriate on-site safety precautions"); *cf. Cornia v. Wilcox*, 898 P.2d 1379, 1384 (Utah 1995) (imposing a presumption of negligence in a property bailment case on defendant because he was "always in a far better position than were plaintiffs to prevent, know, or ascertain the cause of the loss").

"As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient." *Reyes v. Wyeth Labs.*, 498 F.2d 1264, 1276 (5th Cir.1974). Because of this expertise, "health-care professionals are in a position to understand the significance of the risks involved and to assess the relative advantages and disadvantages of a given form of prescription-based therapy." RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 6 cmt. b (1998). On this basis, many courts have concluded that "the prescribing physician of a prescription drug is the person best able to take or recommend precautions" against potential injuries. *Vitanza v. Upjohn Co.*, 257 Conn. 365, 778 A.2d 829, 841 (2001).[19] We agree, and thus reject defendants' request that we withhold a duty on the basis of their supposed inability to prevent the loss at issue here.

3

¶ 32 Finally, defendants offer a series of general policy arguments against the imposition of a duty on physicians to nonpatients. We find these policy concerns insufficient to sustain a categorical decision to withdraw a duty of care across the broad range of negligent prescription cases.

¶ 33 Defendants first assert that the recognition of a physician's duty to nonpatients will diminish the availability of prescription medications by inciting undue caution in physicians who would otherwise offer prescriptions to their patients. This argument gives undue emphasis to the benefits of prescription drugs as a whole while ignoring their costs.

¶ 34 As some courts have recognized, prescribed medications have significant social utility. *See Burroughs v. Magee*, 118 S.W.3d 323, 334–35 (Tenn.2003). But the unquestioned utility of pharmaceuticals is not enough to justify the general disavowal of a duty to use reasonable care in prescribing them. Pharmaceuticals also carry costs, including not just side effects to patients but also risks to third parties. At least in some

circumstances, the benefits of a particularly dangerous drug would clearly be outweighed by its risks. Because there are some pharmaceuticals in some circumstances whose costs outweigh their benefits, it makes no sense to categorically eliminate a duty of care for physicians who prescribe them. When potential risks might outweigh potential benefits for a given activity, tort duties incentivize professionals—whether physicians, mechanics, or plumbers—to consider the potential harmful effects of their actions on both their clients/patients and third parties. And questions about which circumstances pose such a high degree of risk that a physician should have taken greater precautions are questions of breach of duty; they are insufficient to defeat the categorical existence of a duty.

¶ 35 The requirements of breach and proximate cause, moreover, counterbalance any improper incentive to withhold treatment because they pose significant barriers to plaintiffs in negligent prescription cases. A plaintiff must not only demonstrate that the providers conduct fell outside the standard of professional care, but prove that the prescription was the proximate cause of a patients harmful conduct. And causation in these circumstances presents difficult questions of both empirical fact and superseding cause. Ultimately then, defendants' concern regarding decreased availability of healthcare is best dealt with on a case-by-case basis under the elements of breach and proximate cause.

¶ 36 Defendants concerns about the impacts of a duty on malpractice insurance and healthcare costs falter on similar grounds. The supposed effects on insurance premiums and patient costs are speculative, as neither defendants nor their amici have presented any evidence showing that insurance costs are lower in states that do not impose this type of duty on healthcare providers. And in any event, the alternative suggested by defendants is to impose these costs on injured parties and permit negligent physicians to remain unaccountable. It seems more rea-

19. *See also, e.g., Nail v. Publix Super Mkts., Inc.*, 72 So.3d 608, 614 (Ala.2011) ("[T]he physician stands in the best position to ... assess the risks and benefits of a particular course of treatment."); *Martin ex rel. Martin v. Ortho Pharm.* *Corp.*, 169 Ill.2d 234, 214 Ill.Dec. 498, 661 N.E.2d 352, 357 (1996) ("[P]rescribing physicians ... are in the best position to [take precautions] concerning the dangers associated with prescription drugs.").

sonable to require physicians and their insurers to account for the consequences of physicians' careless acts than to foist that cost solely on the injured.

¶ 37 Defendants and their amici also contend that nonpatient suits will interfere with confidentiality in physician-patient relationships. In cases brought by nonpatients, defendants amici assert, providers would "necessarily be required to disclose" confidential medical information because "[n]onpatient plaintiffs would necessarily be given the right to demand production in discovery" of "confidential patient records." This concern seems overblown. The physician-patient privilege and medical privacy statutes are carefully designed to protect confidentiality and patient privacy, and a party concerned about confidentiality in discovery may seek refuge in a protective order. And even if the existing law on physician-patient confidentiality is imperfectly attuned to the concerns implicated in negligent prescription cases filed by nonpatients, the solution is to fine-tune that law, not to categorically foreclose the imposition of a duty.

¶ 38 Defendants also argue that a duty to nonpatients would conflict with the physicians duty of loyalty to her patient. Quoting *Webb v. Jarvis*, 575 N.E.2d 992 (Ind.1991), defendants assert that "[i]mposing a duty on a physician to predict a patients behavioral reaction to medication and to identify possible plaintiffs would cause a divided loyalty," requiring the "physician to weigh the welfare of unknown persons against the welfare of his patient." *Id.* at 997. We do not see this concern as sufficient to warrant a categorical rule eliminating any duty to consider the risk of harm to nonpatients. Even if the doctor's loyalty is only to her patient, the patients welfare encompasses an interest in minimizing a risk of causing harm to third parties. A physician concerned about her patient presumably would be interested in weighing that risk along with other concerns more directly personal to the patients welfare.

¶ 39 Along these same lines, some courts have reasoned that " 'individual treatment decisions are best left to patients and their physicians' " because " '[d]octors should not be asked to weigh notions of liability in their already complex universe of patient care.' " *Burroughs*, 118 S.W.3d at 335 (quoting *Les-*

*ter ex rel. Mavrogenis v. Hall*, 126 N.M. 404, 970 P.2d 590, 593 (1998)). We do not doubt the complexity of the medical professional's sphere of judgment. But the complexity of a particular profession does not typically justify the abdication of professional responsibility for negligence. And a "complex universe of patient care" does not make injured nonpatients' injuries any less troubling. It is not too much to ask of a healthcare provider faced with a choice between two otherwise equivalent medications to choose the one that poses the least risk of causing the patient to injure third persons.

### III

¶ 40 Healthcare providers perform a societal function of undoubted social utility. But they are not entitled to an elevated status in tort law that would categorically immunize them from liability when their negligent prescriptions cause physical injury to nonpatients. We uphold a duty of healthcare providers to nonpatients in the affirmative act of prescribing medication, and reverse the district court's conclusion to the contrary.

Justice LEE authored the opinion of the Court, in which Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Justice NEHRING joined.