2019 UT App 168

## THE UTAH COURT OF APPEALS

STUART WOOD AND LAURIE WOOD,
Appellants,
*v.*
UNITED PARCEL SERVICE INC.,
Appellee.

Opinion
No. 20180040-CA
Filed October 18, 2019

Third District Court, Salt Lake Department
The Honorable Patrick Corum
The Honorable Matthew Bates
No. 160900437

Douglas B. Cannon, Christopher F. Bond, and Craig
T. Jacobsen, Attorneys for Appellants

Andrew M. Morse and Nathan R. Skeen, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and DIANA HAGEN
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Stuart Wood and Laurie Wood appeal from the district court's grant of summary judgment in favor of United Parcel Service Inc. (UPS). We affirm.

BACKGROUND

¶2　In 2013, a UPS truck driver backed up and collided with a loading dock at a warehouse managed and operated by KNS International LLC (KNS).[1] The collision damaged the loading dock and an overhead vinyl curtain system KNS had purchased and installed to regulate warehouse temperature. To install the curtain system, KNS drilled sixteen holes in the cinderblock above the loading dock and attached a metal bracket in line with the holes using sixteen concrete anchors. Vinyl curtains were then attached to the overhead bracket.

¶3　On inspection of the area after the collision, one of KNS's assistant managers noticed that the cinderblock to which the curtain system was attached had cracked, that several of the concrete anchors were loose, and that one or two of the

---

1. In its summary judgment motion, UPS did not dispute that one of its trucks collided with the building. But the record also indicates that Stuart Wood's own delivery truck had, "on multiple occasions," struck the loading dock, "connecting with the building and causing damage." KNS's warehouse manager explained that some delivery trucks, including the one used by Wood, were "non-dock high" and should not have been backed up to the dock because their bumpers would make contact with the building below the rubber pads that protected the dock door. The warehouse manager also stated that he recalled multiple trucks "sounding like they were hitting the building, but [he did not] know if they actually did." He said these incidents occurred about once a month. The assistant manager also recalled that trucks hit the dock "multiple times." KNS's vice president stated that he was unaware of any efforts KNS took to investigate how the company could have prevented trucks from hitting the dock.

concrete anchors had fallen out altogether.[2] The assistant manager recalled that he "probably tightened a couple" of the concrete anchors on the overhead bracket, but he did not put the dislodged anchors back into the bracket, because "the structure was compromised" and no longer would have held the anchors. No evidence was submitted to demonstrate that KNS took any further steps to fix the cracked cinderblock or install new concrete anchors to replace the one or two that had fallen out. After tightening the anchors, the assistant manager felt that the curtain system was "secure enough at least for [his] liking."

¶4     On February 4, 2013, sometime from a week to a month after the collision, the vice president of KNS noticed the damage to the same vinyl curtain system above the loading dock door.[3] As he was driving away from the warehouse, he "had a clear view" and could see that approximately "8 to 12 inches" of the curtain bracket was "hanging down at an angle." The vice president did not immediately contact anyone at KNS because he "didn't think that there was any risk [in] it hanging down" as there were "a lot of bolts holding it." He also "didn't think there was any danger to anyone," because "no one, to [his] knowledge, ever goes there throughout the rest of the day."

---

2. The assistant manager, who had helped install the curtain system, claimed that there was no problem with the installation of the vinyl curtains. The assistant manager also performed regular inspections of the building and claimed that he had not seen any problems with the structure of the building in that area before the collision.

3. The record is silent as to the exact date that the UPS truck collided with the dock. UPS did not have any records indicating that damage was sustained by one of its trucks hitting the KNS warehouse during the relevant time period.

¶5    Unfortunately, that same day, Stuart Wood, a driver for a delivery company used by KNS, was present at that same loading dock. As Wood walked through the loading dock door, the curtain system dislodged from the cinderblock, and a bracket fell on his head, knocking him to the ground. The bracket weighed approximately forty-five pounds. After Wood was able to stand, a KNS employee helped him wash blood off of his face. Another employee approached and asked Wood if he was all right. The employee told Wood that "he was sorry, [and] that he knew [the bracket] was going to fall," saying that KNS "should have taken care of it." Wood suffered permanent injuries from the accident.

¶6    Thereafter, Wood filed negligence claims against UPS and KNS, alleging each was liable for his injuries. Wood argued that UPS was negligent as the party that caused the dangerous condition and that KNS was negligent as the party on whose property the dangerous condition existed. At the close of fact discovery, UPS moved for summary judgment, arguing that (1) UPS owed no duty to Wood because UPS did not possess or control the property and (2) UPS's actions were not the proximate cause of Wood's injury. The district court granted UPS's motion on both bases, and the Woods appeal.[4]

ISSUE AND STANDARD OF REVIEW

¶7    To answer whether UPS is liable for the harm to Wood, the threshold issue is whether UPS owed a legal duty of care to Wood at the time of his injury.[5] "Whether a duty of care is owed

_____

4. The Woods settled their claims against KNS, resulting in the entry of a final, appealable judgment.

5. On appeal, Wood raises three discrete issues, but our determination concerning UPS's duty to Wood at the time he

(continued…)

is entirely a question of law to be determined by the court." *Rose v. Provo City*, 2003 UT App 77, ¶ 8, 67 P.3d 1017 (quotation simplified). "Duty must be determined as a matter of law and on a categorical basis for a given class of tort claims." *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 23, 275 P.3d 228. We therefore review the district court's determination on duty for correctness, giving no

---

(…continued)

was injured by the curtain dictates our approach to all the issues raised on appeal. Wood contends (1) that UPS owed him a duty to use reasonable care in the operation of its truck to avoid creating a dangerous condition on property that could injure him, (2) that he submitted sufficient evidence to establish a prima facie case of negligence against UPS, and (3) that the district court erred when it took the issue of causation away from the jury and found that KNS's actions were an intervening cause that cut off UPS's liability. Because UPS does not dispute that it had a duty to use reasonable care in operating its trucks, we do not address Wood's first issue on appeal. But the duty question relevant to our resolution of this appeal is not UPS's general duty to safely operate its vehicles but its specific duty owed to Wood at the time he was injured. Because we determine that UPS did not owe a duty to Wood at the time of his injury, Wood's prima facie negligence claim necessarily fails. *See Young v. Salt Lake City School Dist.*, 2002 UT 64, ¶ 12, 52 P.3d 1230 ("Absent a showing that the defendant owed any duty, the plaintiff's [negligence] claim has no merit, and he or she may not recover."). And absent a duty, it is also unnecessary for us to address the issue of causation as it relates to UPS. *See Smith v. Frandsen*, 2004 UT 55, ¶¶ 9, 12, 94 P.3d 919 (explaining that to prevail in an action for negligence, "a plaintiff must demonstrate the existence of a duty running between the parties" and pointing out that "it is well-established in our law that without a duty, there can be no negligence as a matter of law" (quotation simplified)).

deference to that decision. *See Drake v. Industrial Comm'n*, 939 P.2d 177, 181 (Utah 1997).

ANALYSIS

¶8     "In order to prevail in an action for negligence, a plaintiff must prove that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the breach proximately caused (4) the plaintiff to suffer legally compensable damages." *Cope v. Utah Valley State College*, 2014 UT 53, ¶ 11, 342 P.3d 243. Wood and UPS dispute the duty that is at issue in this case. Wood argues that "UPS owed a duty to . . . Wood" because "UPS's drivers have a duty to use reasonable care to avoid creating a dangerous condition on property which could cause injury to the property's users." (Quotation simplified.) UPS, not disputing the duty of truck drivers to use reasonable care, argues that it owed no duty to Wood at the time of his injury "because UPS did not control the property, and the possessor of the property had actual knowledge of the dangerous condition but failed to remedy it." The district court concluded that UPS owed no duty to Wood because "UPS's duty ended when KNS became aware of the damage UPS caused to its building." We agree and affirm.

¶9     "In negligence cases, a duty is an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 5, 275 P.3d 228 (quotation simplified). The Restatement (Second) of Torts explains how a duty can shift from one party to another: "Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause." Restatement (Second) of Torts § 452(2) (Am. Law Inst. 1965). This rule "covers the exceptional cases in which, because the duty, and hence the entire

responsibility for the situation, has been shifted to a third person, the original actor is relieved of liability for the result which follows from the operation of his own negligence." *Id.* § 452 cmt. d. Because the responsibility shifts, "the duty, or obligation, of the original actor in the matter has terminated, and has been replaced by that of the third person." *Id.*

¶10 Our courts have identified several factors relevant to the question of whether a duty exists, including "(1) whether the defendant's allegedly tortious conduct consists of an affirmative act or merely an omission, (2) the legal relationship of the parties, (3) the foreseeability or likelihood of injury, (4) public policy as to which party can best bear the loss occasioned by the injury, and (5) other general policy considerations." *Jeffs*, 2012 UT 11, ¶ 5 (quotation simplified). "Legal duty, then, is the product of policy judgments applied to relationships." *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 17, 143 P.3d 283. "Not every factor is created equal . . . . [S]ome factors are featured heavily in certain types of cases, while other factors play a less important, or different, role." *Jeffs*, 2012 UT 11, ¶ 5. Applying these factors to this case, we determine that while UPS initially owed a duty to Wood because UPS's truck caused damage to the loading dock, the duty owed to invitees such as Wood shifted to KNS when it learned of and failed to adequately remedy the dangerous condition on its property that UPS created. We now consider the duty factors articulated in *Jeffs* in turn.

## I. The Act in Question and the Legal Relationship Between the Parties

¶11 "As a general rule, we all have a duty to exercise care when engaging in affirmative conduct that creates a risk of physical harm to others." *Sumsion v. J. Lyne Roberts & Sons, Inc.*, 2019 UT 14, ¶ 12, 443 P.3d 1199 (quotation simplified). "Nonfeasance—passive inaction, a failure to take positive steps to benefit others, or to protect them from harm not created by any wrongful act of the defendant—by contrast, generally

implicates a duty only in cases of special legal relationships." *Jeffs*, 2012 UT 11, ¶ 7 (quotation simplified). This case involves both an affirmative act, namely UPS's truck damaging KNS's warehouse, and an omission, namely KNS's failure to remedy the dangerous condition created by UPS. But the critical question in establishing responsibility is whether UPS owed a continuing duty to prevent harm to Wood once UPS no longer had any control over the damaged loading dock. While normally we would look to whether a special relationship existed between Wood and UPS, Wood concedes that there was not an external circumstance that created a special relationship between Wood and UPS post-accident—and no facts in the record demonstrate otherwise. UPS never assumed the responsibility to ensure that KNS's warehouse and vinyl curtain were made safe, and nothing in the record suggests that UPS deprived KNS of the ability to fix its building. But KNS, as the possessor of the property, had such a special relationship with Wood. Our supreme court has held that "[i]n cases where the alleged negligence consists of a failure to act, the person injured by another's inaction must demonstrate the existence of some special relationship between the parties creating a duty on the part of the latter to exercise . . . due care in behalf of the former." *DCR Inc. v. Peak Alarm Co.*, 663 P.2d 433, 435 (Utah 1983). And the relationship between "owners and invitees" gives "rise to such a duty." *Id.*; *see also Johanson v. Cudahy Packing Co.*, 152 P.2d 98, 108 (Utah 1944) (stating that delivery drivers are invitees). Because nothing created a legal relationship between Wood and UPS, and because Wood already had a legal relationship with a present third party, i.e., KNS, who had a responsibility to provide for Wood's safety, this factor weighs against UPS owing a duty to Wood at the time of his injury.

## II. The Party Best Positioned to Bear the Loss

¶12    To determine which party is best positioned to bear the loss, we look to who "is in a superior position of knowledge or control to avoid the loss in question." *Jeffs*, 2012 UT 11, ¶ 30. A

party "is not in a position to bear the loss, not because his pockets are shallow, but because he lacks the capacity that others have to avoid injury by taking reasonable precautions." *Id.* UPS initially was in a position to avoid damaging KNS's warehouse and vinyl curtain, but after the damage was done and had become known to KNS, UPS had (1) no ability or obligation to warn others of the damage it caused to KNS's property, (2) no right or ability to restrict access to KNS's property, and (3) no further ability to repair the property. UPS, being an invitee itself, was also not in a superior position to inspect the property to determine the extent of the damage it had caused. KNS, on the other hand, had (1) immediate knowledge of the damage, (2) control of the property, (3) the right to warn others about the condition, (4) the right to restrict access to the hazardous area, and (5) the right to repair the damage. KNS's control of its own property also provided it with a superior position to know the extent of the damage. Succinctly put, UPS "lack[ed] the capacity that [KNS had] to avoid injury [to others] by taking reasonable precautions." *See id.* Thus, given the facts of this case, UPS was not best situated to bear the loss of Wood's injury at the time the vinyl curtain fell on Wood.

### III. The Foreseeability and Likelihood of Injury

¶13   Wood contends that it was foreseeable "that a damaged or compromised building could injure people in, and particularly underneath, that structure" and that his injury falls within the "same general nature" as the type of injuries a person could be expected to suffer from a truck negligently and forcefully hitting a building and overhead bracket assembly. Wood further argues the fact that the damaged part of the building "failed one week to a month after the blow rather than immediately does not take this case out of the foreseeable general harm identified above." He also argues that "it is equally foreseeable that an owner of the property may not properly fix the damaged building part."

¶14 "[F]oreseeability in [the context of a] duty analysis is evaluated at a broad, categorical level." *Jeffs*, 2012 UT 11, ¶ 25. In determining a duty, "foreseeability does not question the specifics of the alleged tortious conduct such as the specific mechanism of the harm" but "instead relates to the general relationship between the alleged tortfeasor and the victim and the general foreseeability of harm." *Id.* (quotation simplified). "Drivers delivering goods purchased by the occupier of premises are invitees" that have "the right to expect to find the premises in a reasonably safe condition." *Johanson*, 152 P.2d at 108–09; *see also Price v. Smith's Food & Drug Centers, Inc.*, 2011 UT App 66, ¶ 26, 252 P.3d 365 ("Store operators and other business owners have a nondelegable duty to the public to keep their place of business in a reasonably safe condition and free from danger of personal injury." (quoting 41 Am. Jur. 2d *Independent Contractors* § 45 (2005))). In determining foreseeability, a plaintiff is not required to show certainty "that the particular accident would occur, but only that there is a likelihood of an occurrence of the same general nature." *Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1346 (Utah 1993) (quotation simplified).

¶15 Because Wood's injury did not happen contemporaneously with UPS's truck colliding with the dock, but one week to one month after that collision, no continuing relationship existed between UPS and Wood. This lack of a continuing relationship informs our foreseeability analysis. It was certainly foreseeable that damaging the loading dock created a potentially unsafe condition. The key here is not the foreseeability of the potential harm to a third person but UPS's inability to do anything to prevent that injury. On the other hand, KNS had a relationship with Wood and owed him, as its invitee, a continuing duty to keep its property safe. *See Hill v. Superior Prop. Mgmt. Services, Inc.*, 2013 UT 60, ¶ 21, 321 P.3d 1054 ("[P]ossessors owe significant duties to invitees who come onto their property—including affirmative duties to remedy or warn against dangerous conditions."). We agree with Wood that it is foreseeable that harm may result from a compromised

building structure and that the mere passage of time does not take an injury from the danger posed by the unsafe condition out of the realm of foreseeability. But given that KNS owed a duty to Wood to maintain safe premises and that it alone had the ability to rectify the unsafe condition on its property, the extent to which the potential harm was foreseeable to UPS is largely a non-factor in our analysis. Though future harm from the damaged vinyl curtain to an invitee may well have been foreseeable to UPS, UPS was not in a position to adequately remedy the condition giving rise to it. In other words, because KNS was uniquely positioned to prevent the curtain from falling and UPS was incapable of doing so, *see supra* ¶ 11, the degree to which UPS may have recognized foreseeable harm to a third party is irrelevant here.

## IV. Other General Policy Considerations

¶16 Wood acknowledges public policy considerations cut "both for and against imposing a duty," stating that "UPS, as the original tortfeasor, was in the best position to prevent injury in the first place if it had simply followed the proper rules for backing." And KNS, as the owner of "the damaged bracket system, also had an opportunity to fix the problem and prevent the injury." Therefore, Wood argues, he should be allowed to pursue a remedy against both KNS and UPS, and the jury should allocate fault between KNS and UPS.

¶17 In this instance, the public policy considerations weigh against imposing a duty on UPS when KNS was the party that failed to adequately remedy known damage to its building. Our conclusion is meant to incentivize the party that has knowledge of a dangerous condition, has control of the property to remedy that dangerous condition, and can take the proper steps to ensure that its premises are made safe for invitees. Certainly UPS may be liable to pay the cost of any required repairs for the damage its truck caused, but the law cannot be stretched to allocate a continuing responsibility on UPS to ensure that KNS

actually took steps to repair its own property. As UPS argues, imposing a duty on UPS in this circumstance could leave "a person . . . perpetually liable for all harm that results from the hazardous condition he or she creates on property possessed by someone else," which would "ignore KNS's ability—and UPS's inability—to remedy the hazardous condition." Absent such a rule, property owners might be incentivized to not remedy a hazard caused by a third party on their own property in order to limit the property owner's liability despite the third party's inability to repair or warn others about the hazard.

¶18    In considering the relevant factors, we conclude that the district court correctly determined that UPS did not owe a duty to Wood at the time of his injury. And without a duty owed by UPS, Wood's negligence claim against the company necessarily fails. *See Hughes v. Housley*, 599 P.2d 1250, 1253 (Utah 1979) ("A finding of negligence requires the presence of certain elements, one of which is a duty running between the parties.").

CONCLUSION

¶19    The district court correctly determined that UPS owed no duty to Wood at the time of his injury. Accordingly, we uphold the district court's grant of summary judgment in favor of UPS.

¶20    Affirmed.

————