*This opinion is subject to revision before final publication in the Pacific Reporter.*

**2013 UT 60**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

COLLEEN HILL,
*Plaintiff and Appellant,*

*v.*

SUPERIOR PROPERTY MANAGEMENT SERVICES, INC.,
*Defendant and Appellee.*

No. 20120428
Filed October 11, 2013

Third District, Salt Lake
The Honorable Paul G. Maughan
No. 100920934

Attorneys:

Nathan D. Alder, Sarah E. Spencer, Salt Lake City, for appellant

Paul M. Belnap, David E. Brown, Salt Lake City, for appellee

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT and ASSOCIATE CHIEF JUSTICE NEHRING
joined.

JUSTICE PARRISH filed an opinion concurring in part and dissenting
in part, in which JUSTICE DURHAM joined.

JUSTICE LEE, opinion of the court:

¶1 A condominium resident was injured when she tripped on a group of tree root offshoots concealed within the grassy common area of her complex. She sued the complex's contract property management company, which was tasked with performing some maintenance activities in that area. She claimed that the company had been negligent in dealing with the tree offshoots, asserting that it had breached duties it owed her under its maintenance contract, arising from its status as a possessor of land, and based on its voluntary undertaking of root maintenance.

¶2    The district court granted the company's motion for summary judgment, concluding that the company owed the resident no duty of care. We affirm. The company lived up to its relevant obligations under the maintenance contract, exercised insufficient control to be treated as a possessor, and never voluntarily undertook the root maintenance activities alleged by the plaintiffs.

I

¶3    Colleen Hill has lived in the Waterbury Condominiums since 2006.[1] Near her condo unit there is a grass-covered common area that, in April 2009, had a large tree growing in it. That tree generated a number of offshoots that protruded upward from the tree roots in various places throughout the common area.

¶4    Because Hill was aware of these growths, and believed them to be trip hazards, she generally tried to avoid the common area. But on April 2, 2009, her dog ventured onto the lawn to relieve itself, and she followed it to clean up—as required by condominium regulations. In doing so, she proceeded cautiously, but nonetheless tripped on some of the tree shoots. She testified that they were difficult to see that day because they were "like sticks" and "blended in with the dead lawn."[2]

¶5    To recover for her resulting injuries, Hill brought a negligence suit against Superior Property Management Services, Inc., and against the Waterbury Homeowners Association. Hill claimed negligence by Superior in the performance of its maintenance and landscaping responsibilities at Waterbury. She also asserted that Waterbury HOA was vicariously liable for Superior's failings and directly liable under theories of premises liability.

---

[1] The facts as stated here are in the light most favorable to Hill, as the nonmoving party on summary judgment.

[2] Several days after the accident, the common area where Ms. Hill had fallen was blocked off with caution tape and rebar. It is unclear who blocked off the area. Later on, the tree was removed altogether, though again it is unclear who removed it.

¶6 Superior performed maintenance and landscaping activities at Waterbury under a maintenance contract with the Waterbury HOA. It had done so since the mid-1990s. Under the parties' contract, Superior performed certain maintenance activities relating to the common area, including mowing "lawn grass weekly and edg[ing] bi-weekly throughout the normal growing season" and "trim[ming] all small and lower branches when necessary." Waterbury HOA retained responsibility, however, for a number of maintenance functions, including "major sidewalk repairs," "major trimming of all large trees," "major fence repairs," "major breaks" of sprinklers, "major roof repairs," and "major painting projects."

¶7 Both Superior and Waterbury HOA moved for summary judgment, claiming that they owed Hill no duty of care—and thus could not have been negligent. Hill opposed both motions, asserting that Waterbury owed her a duty as a possessor of land and that Superior owed her a duty under its maintenance contract, based on a variety of premises liability theories, and due to its voluntary undertakings. The court granted Superior's motion, determining that Superior owed Hill no duty of care because it had not violated any contractual obligation, exercised insufficient control over the property to be subject to premises liability, and had not voluntarily undertaken to remedy the hazard posed by the tree shoots. The court denied Waterbury HOA's motion, however, concluding that it was potentially liable as a possessor. Thereafter, Waterbury HOA settled with Hill and was dismissed as a party to this action.

¶8 Hill then filed this appeal. We review the district court's summary judgment decision for correctness. *See Bahr v. Imus,* 2011 UT 19, ¶ 15, 250 P.3d 56.

II

¶9 Hill asserts that Superior owed her a duty of care (a) arising under Superior's maintenance contract, (b) due to its extensive control of the condominium premises, (c) based on its voluntary undertaking of tree maintenance activities, and (d) because it affirmatively created the hazardous clumps of tree shoots that allegedly caused her accident. We find no basis for a duty in any of the first three asserted grounds, and conclude that Hill failed to preserve the fourth. We accordingly affirm.

### A. Contract Duty

¶10 Tort law draws a critical distinction between affirmative acts and omissions. As a general rule, we all have a duty to act reasonably in our affirmative acts; but no such duty attaches with regard to omissions except in cases of a special relationship. *See Jeffs ex rel. B.R. v. West*, 2012 UT 11, ¶ 7, 275 P.3d 228.

¶11 Our cases have sometimes adverted to the possibility that a special relationship sustaining such a duty might be rooted in a contract. *See id*. ¶ 9 n.7. Invoking this principle, Hill argues that Superior's maintenance contract gave rise to a tort duty, which it breached by failing to perform under two provisions of the contract. The first requires Superior to "mow . . . lawn grass weekly and edg[e] bi-weekly throughout the normal growing season." The second obligates it to "trim . . . small and lower branches." We disagree, and find that neither provision supports the imposition of tort liability.

¶12 In the first place, it is not at all clear that mere failure to perform would sustain liability in tort. A breach of contract, after all, typically gives rise to liability in contract, not in tort.[3] Even

---

[3] *See, e.g., Beck v. Farmers Ins. Exch.,* 701 P.2d 795, 800 & n.3 (Utah 1985) (holding "that in a first-party relationship between an insurer and its insured, the duties and obligations of the parties are contractual rather than fiduciary" and that "[w]ithout more, a breach of those implied or express duties can give rise only to a cause of action in contract, not one in tort," but further noting that some "acts constituting a breach of contract may also result in breaches of duty that are independent of the contract and may give rise to causes of action in tort"); *DCR Inc. v. Peak Alarm Co.,* 663 P.2d 433, 435–36 (Utah 1983) (explaining that tort and contractual duties are distinct and that tort liability does not necessarily follow directly from a contractual breach, although a contractual relationship may give rise to a relationship on which a tort duty is premised); *see also Esty v. Beal Bank S.S.B.,* 298 S.W.3d 280, 301 (Tex. App. 2009) ("Although a party's actions may breach duties in tort, contract, or both, Texas Jurisprudence has long recognized that mere nonfeasance under a contract creates liability only for breach of contract." (internal quotation marks omitted)); *Mesmer v. Md. Auto. Ins. Fund*, 725 A.2d 1053, 1058 (Md.

assuming that Superior's maintenance contract could sustain a tort duty, moreover, there is still no basis for liability here, as neither of the provisions cited by Hill required Superior to perform the acts it is now charged with omitting.

¶13 The first-cited provision required Superior to mow the "lawn grass weekly and edg[e] bi-weekly *throughout the normal growing season*." (Emphasis added). Yet it was undisputed that the normal growing season had not yet commenced at the time of Hill's injury. Hill effectively conceded as much in her assertion that the grass appeared to be dead at the time of the accident. And it was undisputed that Superior, which had performed mowing activities at Waterbury for many years prior to the accident, had never started mowing until at least the second week of April. This was further "course of conduct" evidence that April 2 fell outside of the "normal growing season" referenced in the contract.[4] Thus, at the time of Hill's accident, Superior was not contractually required to mow the lawn, and accordingly not in breach for failing to do so.

---

1999) ("Mere failure to perform a contractual duty, without more, is not an actionable tort." (internal quotation marks omitted)); *Chamberlaine & Flowers, Inc. v. Smith Contracting, Inc.*, 341 S.E.2d 414, 417 (W. Va. 1986) ("[T]here is generally no tort liability for failing to do what one has contracted to do, unless there is some duty to act apart from the contract."); *Morgan v. S. Cent. Bell Tel. Co.*, 466 So. 2d 107, 114 (Ala. 1985) ("There is, in Alabama, no tort liability for nonfeasance for failing to do what one has promised to do in the absence of a duty to act apart from the promise made. On the other hand, misfeasance, or negligent affirmative conduct in the performance of a promise generally subjects an actor to tort liability as well as contract liability for physical harm to persons and tangible things.").

[4] *See Peterson v. Sevier Valley Canal Co.*, 151 P.2d 477, 479 (Utah 1944) (interpreting a contractual provision in light of the parties' "course of conduct"); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 202(4) (1981) (explaining that "any course of performance accepted or acquiesced in without objection is given great weight in the interpretation" of a contract).

¶14 The second-cited provision required Superior to "trim all smaller and lower branches when necessary." This provision was not implicated in any way by the tree shoots in question. Though Hill characterizes the tree growths as "branches," the contract does not bear that construction.

¶15 Dictionary definitions of "branch" (in the sense of a tree branch) refer uniformly to the notion of "a stem growing *from the trunk or from a limb of a tree*" or a "shoot or secondary stem *growing from the main stem*." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 267 (3d ed. 1961) (emphasis added).[5] Thus, the "branches" to be trimmed under Superior's maintenance contract are protrusions from the main trunk only, not separate shoots stemming from the tree's roots.[6] Superior could not be in breach for failing to trim back those shoots.

¶16 Hill nonetheless contends that Superior's obligations were not comprehensively detailed in its maintenance contract, but encompassed acts that it habitually engaged in over time. We see no basis for extending a duty encompassing Superior's extracontractual acts. Even if duties spelled out expressly by contract could sustain parallel tort duties—a question we need not and do not reach, *see supra* ¶ 11—there is no room in our law for a tort duty arising from course-of-performance acts that are nowhere provided by contract.

¶17 Where a duty is rooted in the express language of a written contract, the parties are on notice of their obligations, and are in a good position to plan their activities around them. That is not at

---

[5] *See also* RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 253 (2d ed. 1987) (defining "branch" as a "division or subdivision of the stem or axis of a tree"); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 223 (5th ed. 2011) (defining "branch" as a "secondary woody stem or limb growing from the trunk or main stem of a tree . . . or from another secondary limb").

[6] *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2235 (3d ed. 1961) (defining "stem" as "the main and usu[ally] wholly or predominantly aerial axis, trunk, or body of a tree or other plant").

all true for the extracontractual, course-of-performance acts relied on by Hill. If we were to impose a duty in connection with those acts, we would establish a troubling perverse incentive. A party facing a tort duty in connection with any undertaking not required by contract would be discouraged from such undertaking. And a disincentive for gratuitous service benefiting another is not the sort of conduct that our tort law ought to countenance.[7] In any event, to the extent injuries ensue from negligence in the performance of such activities, liability would properly be governed by a different branch of our tort law—by the standards governing liability for a voluntary undertaking, a theory we consider (and find unavailing) below. *See* discussion *infra* ¶¶ 39–40.

¶18 We accordingly reject Hill's request that we overlook the express terms of Superior's maintenance contract in assessing whether Superior had a contract-based duty in tort law. And even assuming that a breach of the maintenance contract could give rise to tort liability, we conclude that Superior did not breach any provisions of the contract.

## B. Premises Liability

¶19 We likewise reject Hill's assertion that a duty arose under three different theories of premises liability: (1) possessor liability, (2) liability of a party who receives the "entire charge of the land" from a possessor under section 387 of the Restatement (Second) of Torts, and (3) liability of a contractor "who does an act or carries on an activity upon land on behalf of the possessor" pursuant to section 383 of the Restatement.

---

[7] *See Higgins v. Salt Lake Cnty.*, 855 P.2d 231, 237 (Utah 1993). ("Determining whether the actor has a duty to prevent another's harm requires careful consideration of the consequences of imposing that duty . . . for society."); *Robinson v. Tripco Inv., Inc.*, 2000 UT App 200, ¶ 40, 21 P.3d 219 ("The law of torts is based on the principle of compensation of individuals for injuries sustained as a result of the unreasonable conduct of another. Tort law also serves the purpose of preventing future harm." (internal quotation marks omitted)).

¶20  None of these theories sustains a duty here. While Superior performed many maintenance functions, it exercised insufficient control of the Waterbury property to be deemed a possessor. As for section 387, the liability principles stated there do not extend to Superior for similar reasons; it did not take over the entire charge of the land. And section 383, which affords independent contractors the same immunity from liability to trespassers that possessors enjoy, would not require Superior to deal with the tree shoots differently than it did.

### 1. Possessor liability

¶21  Under our precedent, possessors owe significant duties to invitees who come onto their property—including affirmative duties to remedy or warn against dangerous conditions. *See Hale v. Beckstead*, 2005 UT 24, ¶¶ 7–8, 116 P.3d 263. Hill's attempt to invoke this liability fails, however, because Superior exercises insufficient control over the land to qualify as a possessor.

¶22  Although we have not articulated a comprehensive list of attributes of a "possessor," we have generally invoked the standard for invitees in the Restatement (Second) of Torts. *See id.* And that standard defines a "possessor" as "a person who is in occupation of the land with intent to control it"; "a person who has been in occupation of the land with intent to control it, if no other person has subsequently occupied it with intent to control it"; or "a person who is entitled to immediate occupation of the land, if no other person is in possession" under either of the other two tests. RESTATEMENT (SECOND) OF TORTS § 328E (1965). Thus, under the Restatement, "control" stemming from actual "occupation," or from an immediate entitlement to actual occupation, is the hallmark of possessor status.

¶23 Our caselaw carries forward this same focus. We have emphasized that a "possessor is one in actual physical possession" of property, *English v. Kienke*, 848 P.2d 153, 156 (Utah 1993), or one who is in "occupation of the land with intent to control it," *Stevens v. Colorado Fuel & Iron*, 469 P.2d 3, 5 (Utah 1970). Those who have qualified as possessors in our cases have been landowners and others exercising plenary control over store premises. *See Hale*, 2005 UT 25, ¶¶ 7–8 (involving a landowner); *English* 848 P.2d at 156 (assuming, "for the purposes of our analysis," that a landowner was a possessor of land); *Wheeler v. Jones*, 431 P.2d 985,

986 (Utah 1967) (discussing possessor liability in the context of a suit against a business, where defendant operated a swimming pool "in connection with" a store that was in the "business of selling garden supplies and swimming pools and equipment"). Thus, while we have not yet articulated a comprehensive definition of "possessor," our cases emphasize the importance of a key factor—control—and require that the degree of control be substantial.[8]

¶24 A person who has the control of a landowner in actual occupation of property has both the rights and the corresponding abilities to deal with the property as he sees fit. *See Harris v. Traini*, 759 N.E.2d 215, 225 (Ind. Ct. App. 2001) ("[O]nly the party who controls the land can remedy the hazardous conditions which exist upon it and only the party who controls the land has the right to prevent others from coming onto it."(alteration in original, internal quotation marks omitted)). Among these are (a) the right to exclude others from the property altogether[9] and (b) the

---

[8] Courts in other jurisdictions have also emphasized this factor. *See, e.g., Downs v. A & H Constr. Ltd.*, 481 N.W.2d 520, 523 (Iowa 1992) (addressing the issue of whether a general contractor retained "sufficient control over" a building project to owe possessor duties to the employee of a subcontractor); *see also McDevitt v. Sportsman's Warehouse, Inc.*, 255 P.3d 1166, 1171 (Idaho 2011) (concluding that defendant could not be liable because it lacked control); *Rhodes v. Wright*, 805 N.E.2d 382, 385 (Ind. 2004) ("In premises liability cases, whether a duty is owed depends primarily upon whether the defendant was in control of the premises when the accident occurred.").

[9] *See O'Connell v. Turner Constr. Co.*, 949 N.E.2d 1105, 1109–10 (Ill. App. Ct. 2011) (explaining that a prerequisite to premises liability is that "defendant be a possessor of land" and affirming summary judgment in favor of a defendant because the facts did not show that the defendant exercised "exclusive control" or "dominion" over the property since he could not, for example, "exclude anyone from the premises" (internal quotation marks omitted)); *Hoffner v. Lanctoe*, 802 N.W.2d 648, 651–52 (Mich. Ct. App. 2010) (defining a possessor as one who "may exercise control over something to the *exclusion of all others*," and reversing

right to take all necessary precautions and make necessary repairs.[10]

¶25 The right of exclusion is significant. A person with such a right may effectively limit her exposure to liability, as a landowner owes only minimal duties to trespassers,[11] but more significant duties to licensees and invitees.[12] And a person with the right to exclude others from her property is free to determine

---

denial of summary judgment for a defendant who lacked the requisite degree of control (internal quotation marks omitted)), *rev'd in part on other grounds*, 821 N.W.2d 88 (Mich. 2012); *Thayer v. James Whitcomb Riley Festival Ass'n.*, 802 N.E.2d 7, 11–13 (relying in part on the fact that defendant did not have the ability to exclude others from the property in concluding that it was not a "possessor").

[10] *See O'Connell*, 949 N.E.2d at 1109–10 (affirming summary judgment in favor of a defendant because the facts did not show that the defendant exercised "exclusive control" or "dominion" over the property since he could not, for example, "alter what was built where" and merely had "overall responsibility for grounds and site conditions" (internal quotation marks omitted)); *Gragg v. Witchita State Univ.*, 934 P.2d 121, 131 (Kan. 1997) (affirming summary judgment for defendants because they lacked "authority to implement different security measures" or "any ability to remedy [the] danger"); *Harris*, 759 N.E.2d at 225 ("[O]nly the party who controls the land can remedy the hazardous conditions which exist upon it . . . . ") (alteration in original, internal quotation marks omitted).

[11] *See Pratt v. Mitchell Hollow Irrigation Co.*, 813 P.2d 1169, 1172 (Utah 1991) ("Generally, a landowner owes no duty to a trespasser, except to refrain from causing willful and wanton injury to him or her." (internal quotation marks omitted)).

[12] *See, e.g., English v. Kienke*, 848 P.2d 153, 156 (Utah 1993) (setting forth the duties owed to an invitee); *Schlueter v. Summit Cnty.*, 480 P.2d 140, 141–42 (Utah 1971) (setting forth duties owed to a licensee); *see also, generally, Whipple v. Am. Fork Irrigation Co.*, 910 P.2d 1218, 1220 (Utah 1996) ("This court has often recognized that the duty owed by a possessor of land to another person depends on whether that person is an invitee, a licensee, or a trespasser.").

how broadly to open her property to others, weighing the economic benefits against the costs (including increased liability).

¶26 The right to take necessary precautions and make repairs is also pivotal. A person with plenary control of property is entitled to take precautions to prevent business invitees or licensees from encountering dangerous conditions on the land. And where a repair is required, a person with plenary control is likely to be able to make it. Under the Restatement, possessors must "exercise reasonable care" in identifying dangerous conditions and in protecting invitees against them—conditions that invitees will not "discover or realize" on their own or "will fail to protect themselves against." RESTATEMENT (SECOND) OF TORTS § 343 (1965). Yet a person with less than full control over property might lack the ability to take measures necessary to protect an invitee against such conditions.

¶27 Superior lacks these core capacities. In the first place, there is no indication that it has the right to exclude others from the Waterbury property. All indications are that Waterbury has retained that right—suggesting that *Waterbury* is the current possessor, and that Superior has not occupied the property "with intent to control it." *Id.* § 328E.

¶28 Further, Superior has only limited authority to perform repairs. Most *major* repairs are beyond the scope of its authority. Under the maintenance contract, "major sidewalk repairs will be contracted out by Waterbury," along with "major trimming of all large trees," "major fence repairs," "major breaks" of sprinklers, "major roof repairs," and "major painting projects."

¶29 Thus, despite Superior's many duties under the management contract, it lacks plenary authority to engage in whatever measures it might deem necessary to prevent harm to those who visit the property. Yet possessor liability would extend to injuries resulting from hazards Superior has little or no control over. Possessor liability is not strict liability. It is a negligence-based theory, which thus depends upon a failure to exercise "reasonable care." *See id.* § 343 (imposing possessor liability for failure to "exercise reasonable care"). A party like Superior who lacks the control necessary to undertake plenary care is not a possessor, and thus has no duty as such.

### 2. Restatement section 387

¶30 Possessor liability, however, is not the only type of premises liability recognized by the law. Where an "owner or possessor of land turns over the entire charge of the land" to "[a]n independent contractor or servant," that person "is subject to the same liability for harm . . . as though he were the possessor of the land." *See* RESTATEMENT (SECOND) OF TORTS § 387 (1965). Hill invokes this principle in arguing that Superior received the "entire charge" of the Waterbury premises and thus acquired the duties of a possessor.

¶31 We see the matter differently. Even Superior's substantial maintenance responsibilities do not rise to the level of taking "entire charge" of property.[13] As the comments to section 387 clarify, this theory of liability does not extend to a contractor who has merely "undertaken to make specific repairs, or even to inspect the land or building and from time to time make such repairs as he should discover to be necessary." *Id.* cmt. a. To impose such liability "the contractor must have taken over the entire charge of the land or building." *Id.* Thus, the rule in section 387 is "usually applicable" in circumstances where a contractor "takes over the entire charge of a building or parcel of land, *including* the renting or collection of rent as well as its maintenance in safe repair." *Id.* cmt. b (emphasis added).

---

[13] *See Kay v. Danbar, Inc.*, 132 P.3d 262, 272 (Alaska 2006) (declining to impose liability pursuant to section 387 because of "doubt that the evidence could reasonably support a finding that RE/MAX undertook complete control and responsibility for the Tanner brothers' duplex, so as to make it responsible for curing major structural defects"); *Virgin v. McDonald's Rest.*, No. Civ. A. 5:04 CV208R, 2005 WL 2123535, at \*2 (W.D. Ky. Sept. 2, 2005) (granting a defendant's motion for summary judgment because the plaintiff, whose action was premised on section 387 of the Restatement, had failed to show that the "entire charge" of the property had been turned over to the defendant); *Cont'l Paper & Supply Co. v. City of Detroit*, 545 N.W.2d 657, 659 (Mich. 1996) (explaining that the level of control required by section 387 is "absolute control").

¶32 Here, Waterbury retained responsibility for a variety of maintenance duties and also continued to be responsible for collecting fees from tenants. These retained responsibilities foreclose the imposition of section 387 premises liability on Superior.

### 3. Restatement section 383

¶33 Even if Superior had less than the "entire charge" of the property, Hill still seeks to impose a possessor-like duty on Superior under section 383 of the restatement. That provision, which we have never formally adopted, articulates a limitation of liability for "[o]ne who does an act or carries on an activity upon land on behalf of the possessor" for physical harm caused thereby to others upon and outside of the land." RESTATEMENT (SECOND) OF TORTS § 383 (1965). The liability limitation is this: Section 383 clarifies that "one acting on behalf of the possessor" is treated as a possessor, in that such person "is given the same immunity from liability to trespassers as is conferred upon the possessor."[14] *Id.* cmt. b.

¶34 Hill reads section 383 as articulating a broad principle of possessor-like premises liability that attaches whenever an independent contractor undertakes activities on behalf of a possessor. And because Superior engaged in some activities related to the maintenance of the Waterbury common area (e.g., mowing), Hill maintains that it was also required to engage in others related to tree shoots as well (e.g., removal)—given that Waterbury, as a possessor, was allegedly required to do more.

¶35 Hill's expansive reading of section 383 is untenable. This provision reaches only "physical harm caused" by affirmative "act[s]" or "activit[ies]" actually carried out by the independent contractor. *Id.* It does not impose liability for mere conditions on

---

[14] *See, e.g., Taylor v. Duke*, 713 N.E.2d 877, 881 (Ind. Ct. App. 1999) (affirming summary judgment for a trucking company that had run over a homeless teenage boy because the trucking company had been acting on behalf of the possessor of the premises and owed the boy, a trespasser, only a minimal duty— "to refrain from wantonly or willfully injuring him after discovering his presence").

the land. *Id.* According to the Restatement comments, this section "applies only to harm done by some act done or activity carried on upon the land"; "[t]he rules which determine liability for bodily harm caused by a dangerous condition created upon the land by persons acting on behalf of the possessor" are stated in other sections. *Id.* cmt. c.

¶36 These limitations are important. Section 383 articulates a liability limitation, not an expansive theory of premises liability for conditions on the land. An independent contractor engaged in a limited activity—such as painting—cannot properly be subject to possessor-like premises liability. For reasons explained above, such broad liability is appropriately reserved for those who exercise a level of control over property similar to that exercised by an owner in actual occupation.

¶37 Thus, Hill's reliance on section 383 is misplaced. We decline her invitation to employ the liability-limiting principles in that provision to impose broad possessor-like premises liability.

## C. Voluntary Undertaking

¶38 In addition to her premises liability theories, Hill advances a voluntary undertaking theory. She invokes section 323 of the Restatement, which provides that a person who "undertakes . . . to render services to another which he should recognize as necessary for the protection of the other's person" is liable "for physical harm resulting from" a "failure to exercise reasonable care to perform [the] undertaking" if either (a) that "failure . . . increases the risk of such harm," or (b) that "harm is suffered because" the other person relies "upon the undertaking." RESTATEMENT (SECOND) OF TORTS § 323 (1965). Because Superior voluntarily engaged in mowing activities, Hill contends that it also undertook responsibility for maintaining the tree growths and that it performed those activities deficiently—in a manner that she relied upon and that also increased her risk of harm.

¶39 This theory falters in its failure to connect up any activity that Superior voluntarily undertook with an allegation of negligence *in the performance of that activity*. Hill makes broad assertions relating to Superior's many maintenance activities, and its allegedly pervasive control over the Waterbury grounds. But

the only *specific* voluntary undertaking she points to is its mowing of the lawn (and of the tree shoots in the process).[15]

¶40 That limited activity is insufficient to establish a broad duty to perform comprehensive maintenance activities related to the tree shoots. As Hill has acknowledged, the tree shoot hazard could not be remedied by mere mowing; additional activities were required to achieve that objective. So Superior did not undertake any voluntary action meaningfully aimed at remedying the tree shoots. And because it didn't, Hill cannot demonstrate that the harm she suffered "result[ed] from" a "failure to exercise reasonable care [in] perform[ing] [the] [voluntary] undertaking" of mowing. *Id.*

¶41 Hill's claim is that her injury could have been *prevented* if Superior had chosen to undertake *additional activities*. Superior's more limited undertaking (mowing) did not establish a duty to take additional steps of a similar nature. Its duty, rather, was limited to the extent of its undertaking[16]—a duty that is narrowly

---

[15] Hill also points to the activity Superior allegedly undertook *following* her accident (in allegedly cordoning off the common area with caution tape and in ultimately removing the tree). But these postaccident activities have no bearing on the question whether Superior voluntarily undertook a duty, as Ms. Hill obviously does not argue that she was injured as a result of Superior's deficient performance of these activities, or that she was somehow harmed by relying on its undertaking of these acts.

[16] *See Taylor v. Bi–Cnty. Health Dep't*, 956 N.E.2d 985, 996–97 (Ill. App. Ct. 2011) (rejecting a plaintiff's invocation of the voluntary undertaking theory because "the duty of care to be imposed upon a defendant is limited to the extent of its undertaking" and even though the defendant "undertook to provide [the plaintiff] with childhood vaccinations, the extent of its undertaking was only to do so in accordance with its discretionary policies," which were appropriately followed in declining to provide the vaccine (internal quotation marks omitted)).

construed,[17] and not a basis for a general obligation to undertake affirmative acts in aid of third parties.

## D. Affirmative Conduct

¶42 Hill's final theory, of a duty arising out of Superior's affirmative conduct, is arguably her strongest. *See Jeffs ex rel. B.R.*, 2012 UT 11, ¶ 7 (noting that acts of "misfeasance . . . typically carry a duty of care," while those of "nonfeasance" do not). Under this theory, Hill claims a duty based on Superior's repeated mowing of the tree growths. Specifically, she contends that Superior's repeated mowing created the hardened clumps of tree growths that caused her to trip and fall.[18]

¶43 The problem with this theory is that it was not preserved below. In the district court, Hill made a vague reference to the notion of a duty arising out of "affirmative creation of the harm," but she never articulated any specific basis for imposing such a duty on Superior. Hill's summary judgment briefing alluded generally to the notion that one "who create[s] dangerous conditions on property … owe[s] a duty of reasonable care to third persons." But the brief never connected that theory with *any actual act* that Superior performed to create a dangerous condition. Instead, in the body of the argument following her invocation of the theory of a duty arising from affirmative creation of harm, Hill reverted to her allegations regarding Superior's *omissions*.

---

[17] *Weber ex rel. Weber v. Springville City*, 725 P.2d 1360, 1364 (Utah 1986) (explaining that while Utah "has recognized that one who undertakes to render services has a duty to exercise reasonable care," the "nature of this rule requires the Court to narrowly construe the scope of any assumed duty").

[18] The argument in her brief is as follows: "The evidence shows that Ms. Hill was tripped by a cluster of rigid tree growths that were hidden underneath lengthy grass. The stiff groupings of roots were not a natural condition that Superior merely passively failed to remove. To the contrary, they were the byproduct of years of Superior's improper maintenance, which included cutting down the growths such that they became hard, shaven, and nubby."

¶44 Specifically, after generally invoking this theory, Hill referred only to Superior's *knowledge* and its *failures to act*. The operative paragraph of Hill's summary judgment brief—the one immediately following the assertion of the general principle of a duty arising from affirmative creation of harm—is the following:

> Superior was responsible for maintaining the grass common areas, including the common area in front of Plaintiff's unit. Superior was aware that residents of Waterbury were permitted to walk upon common areas, and were required to do so to pick up after their pets. Superior was aware of the existence of the "tree root problem" at Plaintiff's unit. Superior was aware that nothing had been done to address the "tree root problem." Despite this knowledge, Superior failed to remove the roots, and failed to trim the grass such that it grew so long that it fully obscured the rigid tree roots below. Superior knew that, if the roots were hidden, it was impossible for someone walking on the common area to ascertain the location of the roots, creating an even more dangerous condition.

Nowhere does Hill identify any affirmative act by Superior that created any harm. Instead she only repeats the charge that Superior knew about the risks and "failed to remove the roots, and failed to trim the grass such that it grew so long that it fully obscured the rigid tree roots below."

¶45 Any doubt about the matter was resolved in the hearing on the motion for summary judgment. When questioned, Hill's counsel clarified that "our position is that it comes down to the fact that the grass had grown over the particular roots that tripped Hill," and emphasized that "if the grass was not covering the roots, there wouldn't be a duty." Nowhere did counsel ever assert the (contrary) point pressed on appeal—that a duty arose from the affirmative creation of harm by Superior's negligent mowing of the tree shoots over the years.

¶46 Hill accordingly failed to preserve the "affirmative creation of harm" theory she advances on appeal. The general invocation of a theory is insufficient. *See 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (to be preserved, an issue must be

(1) "raised in a timely fashion," (2) be "specifically raised," and (3) the "challenging party must introduce supporting evidence or relevant legal authority" (internal quotation marks omitted)). Preservation requires affording the district court a meaningful opportunity to rule on the ground that is advanced on appeal, and that implies, at a minimum, not just the invocation of a legal principle but also its application to the facts of the case. *See Allen v. Friel*, 2008 UT 56 ¶ 9, 194 P.3d 903 (explaining, in the analogous context of our rules regarding adequate briefing on appeal, that we have "repeatedly noted that a brief is inadequate if it merely contains bald citations to authority [without] development of that authority and reasoned analysis based on that authority" (alteration in original, internal quotation marks omitted)); *Tolman v. Winchester Hills Water Co.*, 912 P.2d 457, 461 (Utah Ct. App. 1996) (holding that "[t]he mere mention of an issue without introducing supporting evidence or relevant legal authority does not preserve that issue for appeal" (internal quotation marks omitted)).

¶47 Our adversary system demands at least that much. Our judges cannot be expected to accept the parties' theories as an invitation to root around in the record to see if they might apply. Like an appellate court, a district court "is not a depository in which [a party] may dump the burden of argument and research." *Allen*, 2008 UT 56, ¶ 9 (alteration in original, internal quotation marks omitted). And we cannot accordingly reverse them for failing to undertake that task.

¶48 Hill's theory fails on that basis. She did make general reference to a duty arising from affirmative creation of harm, but she never identified a basis for applying that theory to the facts of this case. Her argument instead had only to do with Superior's knowledge and omissions, which of course have nothing to do with affirmative creation of harm.

¶49 The record citations relied on by the dissent are not to the contrary. It is true that Hill's declaration asserts that she "observed that there were rigid 'stumps' or clumps of sticks that appeared to have resulted from [Superior] repeatedly mowing down new shoots." And that assertion was also repeated in Hill's summary judgment brief. But the brief makes this point only in the background statement of facts. It nowhere repeats it in the argument section—and certainly not as the basis for imposing a duty arising from the affirmative creation of harm.

¶50  The dissent's contrary conclusion is based on the portion of Hill's summary judgment brief that asserts that "[b]y virtue of its deficient . . . maintenance . . . Superior created a more dangerous situation than what existed previously." *Infra* ¶ 61. But the quoted sentence itself makes no mention of any affirmative act creating any harm. This is accordingly just a repetition of the general theory. And this invocation of the theory follows immediately after the full paragraph quoted above (which is the *only* part of the brief that makes any effort to extend this theory to the facts of the case). Again, however, that paragraph makes no mention of any affirmative acts; it focuses only on Superior's knowledge and omissions. So in context, the assertion of a duty arising out of Superior's affirmative "maintenance" is insufficient, as the only deficient maintenance cited in the brief was that it "failed to remove the roots, and failed to trim the grass such that it grew so long that it fully obscured the rigid tree roots below."

¶51  The dissent also cites Hill's supplemental brief on summary judgment, asserting that there "Hill argued that she 'believed the sticks to be the remnants of tree growths or 'suckers' that resulted from repeated mowing and other attempted maintenance by [Superior]." *Infra* ¶ 61. But the quoted statement is not argument; it is from the fact section of the brief. And in any event the supplement brief had nothing to do with the question of duty; it dealt only with whether tree shoots were an "unreasonably dangerous condition" and whether that question was one for the jury.

¶52  The problem with Hill's assertion of a duty arising from "affirmative creation of harm" is not that it was not "emphasized." *Infra* ¶ 62. It is that it was not presented—or at least not presented in a way that gave the district court a meaningful opportunity to rule on it. Perhaps the court could have gone out of its way to connect the dots from Hill's declaration to her later assertion of a theory of a duty arising from the affirmative creation of harm. But we cannot fault the court for not performing that responsibility, which in our adversary system fell ultimately on Hill.

¶53  Thus, in the district court Hill focused on Superior's omissions, not its affirmative conduct. So the theory of affirmative creation of harm due to repeated mowing over fourteen years is not properly before us, as Hill never afforded the district court an

"opportunity to rule on the issue." *Kell v. State*, 2012 UT 25, ¶ 11, 285 P.3d 1133.

¶54 We accordingly decline to reach this issue. And, having rejected all of Hill's grounds for imposing a duty on Superior, we affirm the entry of summary judgment in its favor.

_____

JUSTICE PARRISH, dissenting;

¶55 While in agreement with the majority's conclusions that Superior did not owe Ms. Hill a duty of care based on theories of contract liability, premises liability, or voluntary undertaking, I respectfully dissent from the majority's holding that Ms. Hill failed to preserve in the district court her argument that Superior's affirmative conduct gave rise to a duty. Ms. Hill argued below that Superior affirmatively created the hazardous condition that caused her accident and she reiterated that argument on appeal. I find the argument persuasive. I would therefore hold that Superior owed a duty to Ms. Hill by virtue of its affirmative acts and would therefore reverse the district court's entry of summary judgment in favor of Superior.

## I. MS. HILL ADEQUATELY PRESERVED HER ARGUMENT THAT SUPERIOR'S AFFIRMATIVE ACTS CREATED A DUTY

¶56 Generally, an issue must be preserved below before we will consider it on appeal. *H.U.F. v. W.P.W.*, 2009 UT 10, ¶ 25, 203 P.3d 943 ("We will not address an issue if it is not preserved or if the appellant has not established other grounds for seeking review."). But preservation is not meant to be a trap for the unwary, preventing decisions on the merits of otherwise legitimate claims. Rather, preservation is designed to ensure that issues on appeal have been presented to a lower court such that the lower court has had the "opportunity to address the claimed error." *Kell v. State*, 2012 UT 25, ¶ 11, 285 P.3d 1133 (internal quotations marks omitted). Further, "[o]ur preservation requirement is self-imposed and is therefore one of prudence rather than jurisdiction." *Patterson v. Patterson*, 2011 UT 68, ¶ 13, 266 P.3d 828.

¶57 An issue is sufficiently raised below, and therefore preserved for appeal, when it has been "presented to the district court in such a way that the court has an opportunity to rule on [it]." *Id.* ¶ 12 (alteration in original) (internal quotation marks

omitted).  An issue may be raised directly or indirectly, so long as it is "raised to a level of consciousness such that the trial judge can consider it."  *James v. Preston*, 746 P.2d 799, 802 (Utah Ct. App. 1987).  Once an issue has been raised before the district court, the Utah Rules of Appellate Procedure require that, on appeal, an appellant's brief contain a "citation to the record showing that the issue was preserved in the [district] court." UTAH R. APP. P. 24(a)(5)(A).

¶58  While Ms. Hill emphasized at the district court her argument that Superior failed to properly cut the grass and make the roots visible, she also presented the alternative argument that it was Superior's own affirmative conduct that had created the stumps that caused her fall.  And this alternative argument was also briefed to this court with appropriate citations to the record below.[1]

¶59  Ms. Hill's initial complaint was sufficiently broad to encompass her theory that Superior owed a duty because its affirmative conduct was responsible for the creation of the hazard.  Rule 8(a)(1) of the Utah Rules of Civil Procedure requires only that a plaintiff set forth "a short and plain . . . statement of the claim showing that the party is entitled to relief" in her complaint.  Under rule 8, a plaintiff's complaint must only provide "fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved." *Zoumadakis v. Uintah Basin Med. Ctr., Inc.*, 2005 UT App 325, ¶ 2, 122 P.3d 891 (internal quotation marks omitted).  Ms. Hill's complaint stated that Superior "failed to . . . properly mow . . . the Common Area so as to prevent the roots, stumps, and shoots from causing [Ms. Hill] to trip and fall." Though general, this statement is broad enough encompass Ms. Hill's argument that Superior's affirmative practice of repeatedly mowing the tree shoots over a period of years was negligent and actually created the growths over which she tripped.  In the

---

[1] The issue was contained in the Ms. Hill's brief on pages 1, 2, and 10 with citations to record pages 223–541 (memorandum in opposition to Superior's motion for summary judgment); 1009–35 (supplemental brief in support of motion for summary judgment); 387, ¶ 13 (declaration by Hill); and in 644a (video deposition of Ms. Hill).

context of rule 8's liberalized pleading rules, this statement therefore provided Superior fair notice that its affirmative acts were at issue and led to Ms. Hill's injuries. *Id.*

¶60 Ms. Hill next asserted the affirmative conduct theory in her testimony. In her Declaration, filed in opposition to Superior's motion for summary judgment, Ms. Hill testified that she "observed that there were rigid 'stumps' or clumps of sticks that appeared to have resulted from [Superior] repeatedly mowing down new shoots."[2]

¶61 Ms. Hill raised the argument again in her memorandum opposing Superior's motion for summary judgment. There, she argued that "there were rigid 'stumps' or clumps of sticks that appeared to have *resulted from repeatedly mowing down new shoots.*" (Emphasis added.) Ms. Hill also argued that because Superior had created the dangerous condition, it owed her a duty of care. She stated that "[b]y virtue of its deficient . . . maintenance . . . Superior created a more dangerous situation than what existed previously." Finally, in her supplemental brief filed in support of her own motion for summary judgment, Ms. Hill argued that she "believed the sticks to be the remnants of trees growths or 'suckers' that resulted from repeated mowing and other attempted maintenance by [Superior]."

¶62 In short, Ms. Hill clearly raised below her theory that Superior owed her a duty of care as a result of its affirmative acts of negligently mowing the tree growths over a period of years. And the fact that Ms. Hill may have emphasized her theories arising from Superior's omissions, rather than her alternative theory of Superior's affirmative conduct, does not preclude our review of the issue. Our preservation jurisprudence does not dictate that only "emphasized" arguments made below are preserved. Rather, it requires only that an issue be "presented" to the district court. *See Kell*, 2012 UT 25, ¶ 11; *Patterson*, 2011 UT 68, ¶ 12; *James*, 746 P.2d at 802. I conclude that the issue of Superior's affirmative negligence was sufficiently presented to the district

---

[2] This testimony was consistent with her deposition testimony that "[w]hen [Superior] mowed [the roots] down even with the lawn, they were even with the lawn. Sometimes they would grow faster than the lawn and they would be higher than the lawn."

court. For that reason, I would hold that Ms. Hill adequately preserved her argument that Superior's affirmative acts gave rise to a duty.

## II. SUPERIOR WAS REQUIRED TO ACT REASONABLY

¶63 Believing that the affirmative conduct issue was adequately preserved, I next turn to the merits. The distinction between an act and an omission is central to the assessment of any duty owed to one party by another. Outside of certain special relationships (including those of parent and child, spouses, common carriers and passengers, innkeepers and guests, and possessors of land and invitees), no duty is owed by one party to another for omissions. *Webb v. Univ. of Utah*, 2005 UT 80, ¶ 10, 125 P.3d 906. On the other hand, an affirmative act "carries with it a potential duty and resulting legal accountability for that act." *Id.; see also Jeffs ex rel. B.R. v. West,* 2012 UT 11, ¶ 21, 275 P.3d 228 ("[W]e all have a duty to exercise care when engaging in affirmative conduct that creates a risk of physical harm to others.").

¶64 Here, Superior tended and cared for the common areas of Waterbury. Superior's actions in repeatedly mowing down the tree growths, which led the growths to convert from flexible single, vertical growths into unyielding, horizontal, clustered stumps is the type of affirmative conduct that has the potential to create a risk of physical harm. Superior's affirmative acts in repeatedly mowing down the growths and shoots established a legal duty to account for the consequences of any injuries suffered as a result of any failure to perform those acts in a reasonable and safe manner.

¶65 Although Superior's affirmative acts established a duty of reasonable care, I do not necessarily conclude that its actions were objectively unreasonable. It may have been perfectly reasonable to simply mow over these kinds of tree growths in the course of lawn maintenance. But that is a question for the finder of fact.

¶66 Ms. Hill's claims were dismissed by the district court on summary judgment. On summary judgment, "the standard is not whether *these parties'* minds differ—which they obviously do—but whether reasonable jurors, having been properly instructed by the [district] court, would be unable to come to any other conclusion." *USA Power, LLC v. PacifiCorp*, 2010 UT 31,¶ 32, 235 P.3d 749 (internal quotation marks omitted). The facts here do not suggest that a reasonable juror could come to only one conclusion regard-

ing the reasonableness of Superior's affirmative actions in repeatedly mowing down the shoots. I believe that summary judgment was therefore inappropriate. I would reverse the summary judgment on Ms. Hill's theory that Superior negligently undertook its mowing responsibilities and remand the case for a determination on the merits of that theory.

––––––––––––