Justice LEE,
opinion of the court:
{1 A condominium resident was injured when she tripped on a group of tree root offshoots concealed within the grassy common area of her complex. She sued the complex's contract property management company, which was tasked with performing some maintenance activities in that area. She claimed that the company had been negligent in dealing with the tree offshoots, asserting that it had breached duties it owed her under its maintenance contract, arising from its status as a possessor of land, and based on its voluntary undertaking of root maintenance.
T2 The district court granted the company's motion for summary judgment, conelud-ing that the company owed the resident no duty of care. We affirm. The company lived up to its relevant obligations under the maintenance contract, exercised insufficient control to be treated as a possessor, and never voluntarily undertook the root maintenance activities alleged by the plaintiffs.
I
1 3 Colleen Hill has lived in the Waterbury *1056 Condominiums since 2006.[1] Near her condo unit there is a grass-covered common area that, in April 2009, had a large tree growing in it. That tree generated a number of offshoots that protruded upward from the tree roots in various places throughout the common area.
14 Because Hill was aware of these growths, and believed them to be trip hazards, she generally tried to avoid the common area. But on April 2, 2009, her dog ventured onto the lawn to relieve itself, and she followed it to clean up-as required by condominium regulations. In doing so, she proceeded - cautiously, but - nonetheless tripped on some of the tree shoots. She testified that they were difficult to see that day because they were "like sticks" and "blended in with the dead lawn." [2]
15 To recover for her resulting injuries, Hill brought a negligence suit against Superi- or Property Management Services, Inc., and against the Waterbury Homeowners Association. Hill claimed negligence by Superior in the performance of its maintenance and landscaping responsibilities at Waterbury. She also asserted that Waterbury HOA was vicariously liable for Superior's failings and directly liable under theories of premises liability.
T6 Superior performed maintenance and landscaping activities at Waterbury under a maintenance contract with the Waterbury HOA. It had done so since the maid-1990s. Under the parties' contract, Superior performed certain maintenance activities relating to the common area, including mowing "lawn grass weekly and edgling] bi-weekly throughout the normal growing season" and "trim[ming] all small and lower branches when necessary." Waterbury HOA retained responsibility, however, for a number of maintenance functions, including "major sidewalk repairs," "major trimming of all large trees," "major fence repairs," "major breaks" of sprinklers, "major roof repairs," and "major painting projects."
17 Both Superior and Waterbury HOA moved for summary judgment, claiming that they owed Hill no duty of care-and thus could not have been negligent. Hill opposed both motions, asserting that Waterbury owed her a duty as a possessor of land and that Superior owed her a duty under its maintenance contract, based on a variety of premises liability theories, and due to its voluntary undertakings. The court granted Superior's motion, determining that Superior owed Hill no duty of care because it had not violated any contractual obligation, exercised insufficient control over the property to be subject to premises liability, and had not voluntarily undertaken to remedy the hazard posed by the tree shoots. The court denied Waterbury HOA's motion, however, concluding that it was potentially liable as a possessor. Thereafter, Waterbury HOA settled with Hill and was dismissed as a party to this action.
18 Hill then filed this appeal. We review the district court's summary judgment decision for correctness. See Bahr v. Imus, 2011 UT 19, ¶ 15, 250 P.3d 56.
II
T9 Hill asserts that Superior owed her a duty of care (a) arising under Superior's maintenance contract, (b) due to its extensive control of the condominium premises, (c) based on its voluntary undertaking of tree maintenance activities, and (d) because it affirmatively created the hazardous clumps of tree shoots that allegedly caused her accident. We find no basis for a duty in any of the first three asserted grounds, and conclude that Hill failed to preserve the fourth. We accordingly affirm.
A. Contract Duty
110 Tort law draws a critical distinction between affirmative acts and omissions. As a general rule, we all have a duty to sct reasonably in our affirmative acts; but no *1057 such duty attaches with regard to omissions except in cases of a special relationship. See Jeffs ex rel. B.R. v. West, 2012 UT 11, ¶ 7, 275 P.3d 228.
Our cases have sometimes adverted to the possibility that a special relationship sustaining such a duty might be rooted in a contract. See id. ¶ 9 n. 7. Invoking this principle, Hill argues that Superior's maintenance contract gave rise to a tort duty, which it breached by failing to perform under two provisions of the contract. The first requires Superior to "mow ... lawn grass weekly and edgfe] bi-weekly throughout the normal growing season." The second obligates it to "trim small and lower branches." We disagree, and find that neither provision supports the imposition of tort liability.
{ 12 In the first place, it is not at all clear that mere failure to perform would sustain liability in tort.[3] A breach of contract, after all, typically gives rise to liability in contract, not in torts Even assuming that Superior's maintenance contract could sustain a tort duty, moreover, there is still no basis for liability here, as neither of the provisions cited by Hill required Superior to perform the acts it is now charged with omitting.
{ 13 The first-cited provision required Superior to mow the "lawn grass weekly and edgle]l bi-weekly throughout the normal growing season.'" - (Emphasis added). Yet it was undisputed that the normal growing season had not yet commenced at the time of Hills injury. Hill effectively conceded as much in her assertion that the grass appeared to be dead at the time of the accident. And it was undisputed that Superior, which had performed mowing activities at Waterbury for many years prior to the accident, had never started mowing until at least the second week of April This was further "course of conduct" evidence that April 2 fell outside of the "normal growing season" referenced in the contract.[4] Thus, at the time of Hill's accident, Superior was not contractually required to mow the lawn, and accordingly not in breach for failing to do so.
114 The second-cited provision required Superior to "trim all smaller and lower branches when necessary." This provision was not implicated in any way by the tree shoots in question. Though Hill charae-terizes the tree growths as "branches," the contract does not bear that construction.
15 Dictionary definitions of "branch" (in the sense of a tree branch) refer uniformly to the notion of "a stem growing from the trunk *1058 or from a limb of a tree" or a "shoot or secondary stem growing from the main stem." - See Webster's Third New International Dictionary 267 (3d ed.1961) (emphasis added).[5] Thus, the "branches" to be trimmed under Superior's maintenance contract are protrusions from the main trunk only, not separate shoots stemming from the tree's roots.[6] Superior could not be in breach for failing to trim back those shoots.
116 Hill nonetheless contends that Superior's obligations were not comprehensively detailed in its maintenance contract, but encompassed acts that it habitually engaged in over time. We see no basis for extending a duty encompassing Superior's extracontractual acts. Even if duties spelled out expressly by contract could sustain parallel tort duties-a question we need not and do not reach, see supra ¶ 11-there is no room in our law for a tort duty arising from course-of-performance acts that are nowhere provided by contract.
" 17 Where a duty is rooted in the express language of a written contract, the parties are on notice of their obligations, and are in a good position to plan their activities around them. That is not at all true for the extra-contractual, course-of-performance acts relied on by Hill. If we were to impose a duty in connection with those acts, we would establish a troubling perverse incentive. A party facing a tort duty in connection with any undertaking not required by contract would be discouraged from such undertaking. And a disincentive for gratuitous service benefiting another is not the sort of conduct that our tort law ought to countenance.[7] In any event, to the extent injuries ensue from negligence in the performance of such activities, liability would properly be governed by a different branch of our tort law-by the standards governing liability for a voluntary undertaking, a theory we consider (and find unavailing) below. See discussion infra ¶¶ 39-40.
118 We accordingly reject Hill's request that we overlook the express terms of Superior's maintenance contract in assessing whether Superior had a contract-based duty in tort law. And even assuming that a breach of the maintenance contract could give rise to tort liability, we conclude that Superior did not breach any provisions of the contract.
B. Premises Liability
1 19 We likewise reject Hill's assertion that a duty arose under three different theories of premises liability: (1) possessor liability, (2) liability of a party who receives the "entire charge of the land" from a possessor under section 387 of the Restatement (Second) of Torts, and (8) liability of a contractor "who does an act or carries on an activity upon land on behalf of the possessor" pursuant to section 383 of the Restatement.
20 None of these theories sustains a duty here. While Superior performed many maintenance functions, it exercised insufficient control of the Waterbury property to be deemed a possessor. As for section 887, the liability principles stated there do not extend to Superior for similar reasons; it did not take over the entire charge of the land. And section 3838, which affords independent contractors the same immunity from liability to trespassers that possessors enjoy, would not require Superior to deal with the tree shoots differently than it did.
*1059 1. Possessor liability
21 Under our precedent, possessors owe significant duties to invitees who come onto their property-including affirmative duties to remedy or warn against dangerous conditions. See Hale v. Beckstead, 2005 UT 24, ¶¶ 7-8, 116 P.3d 263. Hill's attempt to invoke this liability fails, however, because Superior exercises insufficient control over the land to qualify as a possessor.
122 Although we have not articulated a comprehensive list of attributes of a "possessor," we have generally invoked the standard for invitees in the Restatement (Second) of Torts. See id. And that standard defines a "possessor" as "a person who is in occupation of the land with intent to control it"; "a person who has been in occupation of the land with intent to control it, if no other person has subsequently occupied it with intent to control it"; or "a person who is entitled to immediate occupation of the land, if no other person is in possession" under either of the other two tests. RESTATEMENT (SEconp) or Torts § 828E (1965). Thus, under the Restatement, "control" stemming from actual "occupation," or from an immediate entitlement to actual occupation, is the hallmark of possessor status.
€ 23 Our caselaw carries forward this same focus. We have emphasized that a "possessor is one in actual physical possession" of property, English v. Kienke, 848 P.2d 153, 156 (Utah 1993), or one who is in "occupation of the land with intent to control it," Stevens v. Colorado Fuel & Iron, 24 Utah 2d 214, 469 P.2d 3, 5 (1970). Those who have qualified as possessors in our cases have been landowners and others exercising plenary control over store premises. See Hale, 2005 UT 24, ¶¶ 7-8, 116 P.3d 263 (involving a landowner); English, 848 P.2d at 156 (assuming, "for the purposes of our analysis," that a landowner was a possessor of land); Wheeler v. Jones, 19 Utah 2d 392, 431 P.2d 985, 986 (1967) (discussing possessor liability in the context of a suit against a business, where defendant operated a swimming pool "in connection with" a store that was in the "business of selling garden supplies and swimming pools and equipment"). Thus, while we have not yet articulated a comprehensive definition of "possessor," our cases emphasize the importance of a key factor-control-and require that the degree of control be substantial.[8]
24 A person who has the control of a landowner in actual occupation of property has both the rights and the corresponding abilities to deal with the property as he sees fit. See Harris v. Traini, 759 N.E.2d 215, 225 (Ind.Ct.App.2001) ("[Oluly the party who controls the land can remedy the hazardous conditions which exist upon it and only the party who controls the land has the right to prevent others from coming onto it." (alteration in original, internal quotation marks omitted)). Among these are (a) the right to exclude others from the property altogether [9] and (b) the right to take all necessary precautions and make necessary repairs.[10]
*1060 125 The right of exclusion is significant. A person with such a right may effectively limit her exposure to liability, as a landowner owes only minimal duties to trespassers,[11] but more significant duties to licensees and invitees.[12] And a person with the right to exclude others from her property is free to determine how broadly to open her property to others, weighing the economic benefits against the costs (including increased liability).
126 The right to take necessary precautions and make repairs is also pivotal. A person with plenary control of property is entitled to take precautions to prevent business invitees or licensees from encountering dangerous conditions on the land. And where a repair is required, a person with plenary control is likely to be able to make it. Under the Restatement, possessors must "exercise reasonable care" in identifying dangerous conditions and in protecting invitees against them-conditions that invitees will not "discover or realize" on their own or "will fail to protect themselves against." RrestarE. MENT (SEconp) or Torts § 348 (1965). Yet a person with less than full control over property might lack the ability to take measures necessary to protect an invitee against such conditions.
T27 Superior lacks these core capacities. In the first place, there is no indication that it has the right to exclude others from the Waterbury property. All indications are that Waterbury has retained that right-suggesting that Waterbury is the current possessor, and that Superior has not occupied the property "with intent to control it." Id. § 328E.
128 Further, Superior has only limited authority to perform repairs. Most major repairs are beyond the scope of its authority. Under the maintenance contract, "major sidewalk repairs will be contracted out by Waterbury," along with "major trimming of all large trees," "major fence repairs," "major breaks" of sprinklers, "major roof repairs," and "major painting projects."
129 Thus, despite Superior's many duties under the management contract, it lacks plenary authority to engage in whatever measures it might deem necessary to prevent harm to those who visit the property. Yet possessor liability would extend to injuries resulting from hazards Superior has little or no control over. Possessor liability is not strict liability. It is a negligence-based theory, which thus depends upon a failure to exercise "reasonable care." See id. § 348 (imposing possessor liability for failure to "exercise reasonable care"). A party like Superior who lacks the control necessary to undertake plenary care is not a possessor, and thus has no duty as such.
2. Restatement section 387
130 Possessor liability, however, is not the only type of premises liability recognized by the law. Where an "owner or possessor of land turns over the entire charge of the land" to "[aJn independent contractor or servant," that person "is subject to the same liability for harm ... as though he were the possessor of the land." See REstaTEMENT (SEconp) or Torts § 387 (1965). Hill invokes this principle in arguing that Superior received the "entire charge" of the Water *1061 bury premises and thus acquired the duties of a possessor.
31 We see the matter differently. Even Superior's substantial maintenance responsibilities do not rise to the level of taking "entire charge" of property.[13] As the comments to section 387 clarify, this theory of liability does not extend to a contractor who has merely "undertaken to make specific repairs, or even to inspect the land or building and from time to time make such repairs as he should discover to be necessary." Id. emt.a. To impose such liability "the contractor must have taken over the entire charge of the land or building." Id. Thus, the rule in section 387 is "usually applicable" in cireum-stances where a contractor "takes over the entire charge of a building or parcel of land, including the renting or collection of rent as well as its maintenance in safe repair." Id. cmt.b (emphasis added).
[ 32 Here, Waterbury retained responsibility for a variety of maintenance duties and also continued to be responsible for collecting fees from tenants. These retained responsibilities foreclose the imposition of section 387 premises liability on Superior.
8. Restatement section 883
133 Even if Superior had less than the "entire charge" of the property, Hill still seeks to impose a possessor-like duty on Superior under section 883 of the restatement. That provision, which we have never formally adopted, articulates a limitation of liability for "[olne who does an act or carries on an activity upon land on behalf of the possessor" for physical harm caused thereby to others upon and outside of the land." ResrtatEmEnt (SEconp) or Torts § 883 (1965). The liability limitation is this: See tion 383 clarifies that "one acting on behalf of the possessor" is treated as a possessor, in that such person "is given the same immunity from liability to trespassers as is conferred upon the possessor." [14] Id. emt.b.
1] 34 Hill reads section 388 as articulating a broad principle of possessor-like premises liability that attaches whenever an independent contractor undertakes activities on behalf of a possessor. And because Superior engaged in some activities related to the maintenance of the Waterbury common area (e.g., mowing), Hill maintains that it was also required to engage in others related to tree shoots as well (e.g., removal)-given that Waterbury, as a possessor, was allegedly required to do more.
1 35 Hill's expansive reading of section 383 is untenable. This provision reaches only "physical harm caused" by affirmative "act[s]" or "activitlies]" actually carried out by the independent contractor. Id. It does not impose liability for mere conditions on the land. Id. According to the Restatement comments, this section "applies only to harm done by some act done or activity carried on upon the land"; "[t]he rules which determine liability for bodily harm caused by a dangerous condition created upon the land by persons acting on behalf of the possessor" are stated in other sections. Id. cmt. c.
1 36 These limitations are important. Section 883 articulates a liability limitation, not an expansive theory of premises liability for conditions on the land. An independent contractor engaged in a limited activity-such as painting-eannot properly be subject to possessor-like premises liability. For reasons *1062 explained above, such broad liability is appropriately reserved for those who exercise a level of control over property similar to that exercised by an owner in actual occupation.
37 Thus, Hill's reliance on section 383 is misplaced. We decline her invitation to employ the liability-limiting principles in that provision to impose broad possessor-like premises liability.
C. Voluntary Undertaking
138 In addition to her premises liability theories, Hill advances a voluntary undertaking theory. She invokes section 828 of the Restatement, which provides that a person who "undertakes ... to render services to another which he should recognize as necessary for the protection of the other's person" is liable "for physical harm resulting from" a "failure to exercise reasonable care to perform [the] undertaking" if either (a) that "failure ... increases the risk of such harm," or (b) that "harm is suffered because" the other person relies "upon the undertaking." - RestarEmENt (SEcownp) or Torts § 828 (1965). Because Superior voluntarily engaged in mowing activities, Hill contends that it also undertook responsibility for maintaining the tree growths and that it performed those activities deficiently-in a manner that she relied upon and that also increased her risk of harm.
139 This theory falters in its failure to connect up any activity that Superior voluntarily undertook with an allegation of negligence in the performance of that activity. Hill makes broad assertions relating to Superior's many maintenance activities, and its allegedly pervasive control over the Waterbury grounds. But the only specific voluntary undertaking she points to is its mowing of the lawn (and of the tree shoots in the process).[15]
1 40 That limited activity is insufficient to establish a broad duty to perform comprehensive maintenance activities related to the tree shoots. As Hill has acknowledged, the tree shoot hazard could not be remedied by mere mowing; additional activities were required to achieve that objective. So Superior did not undertake any voluntary action meaningfully aimed at remedying the tree shoots. And because it didn't, Hill cannot demonstrate that the harm she suffered "result{ed] from" a "failure to exercise reasonable care [in] perform{ing] [the] [voluntary] undertaking" of mowing. Id.
{41 Hill's claim is that her injury could have been prevented if Superior had chosen to undertake additional activities. Superi- or's more limited undertaking (mowing) did not establish a duty to take additional steps of a similar nature. Its duty, rather, was limited to the extent of its undertaking [16]-a duty that is narrowly construed,[17] and not a basis for a general obligation to undertake affirmative acts in aid of third parties.
D. Affirmative Conduct
142 Hill's final theory, of a duty arising out of Superior's affirmative conduct, is arguably her strongest. See Jeffs ex rel. B.R., 2012 UT 11, ¶ 7, 275 P.3d 228 (noting that acts of "misfeasance ... typically carry a duty of care," while those of "nonfeasance" do not). Under this theory, Hill claims a *1063 duty based on Superior's repeated mowing of the tree growths. Specifically, she contends that Superior's repeated mowing created the hardened clumps of tree growths that caused her to trip and fall.[18]
T 43 The problem with this theory is that it was not preserved below. In the district court, Hill made a vague reference to the notion of a duty arising out of "affirmative creation of the harm," but she never articulated any specific basis for imposing such a duty on Superior. Hill's summary judgment briefing alluded generally to the notion that one "who create[s] dangerous conditions on property ... owe[s] a duty of reasonable care to third persons." But the brief never connected that theory with any actual act that Superior performed to create a dangerous condition. Instead, in the body of the argument following her invocation of the theory of a duty arising from affirmative cere-ation of harm, Hill reverted to her allegations regarding Superior's omissions.
T44 Specifically, after generally invoking this theory, Hill referred only to Superior's knowledge and its failures to act. The operative paragraph of Hill's summary judgment brief-the one immediately following the assertion of the general principle of a duty arising from affirmative ereation of harm-is the following:
Superior was responsible for maintaining the grass common areas, including the common area in front of Plaintiffs unit. Superior was aware that residents of Waterbury were permitted to walk upon common areas, and were required to do so to pick up after their pets. Superior was aware of the existence of the "tree root problem" at Plaintiff's unit. Superior was aware that nothing had been done to address the "tree root problem." Despite this knowledge, Superior failed to remove the roots, and failed to trim the grass such that it grew so long that it fully obscured the rigid tree roots below. Superior knew that, if the roots were hidden, it was impossible for someone walking on the common area to ascertain the location of the roots, creating an even more dangerous condition.
Nowhere does Hill identify any affirmative act by Superior that created any harm. Instead she only repeats the charge that Superior knew about the risks and "failed to remove the roots, and failed to trim the grass such that it grew so long that it fully ob-secured the rigid tree roots below."
{45 Any doubt about the matter was resolved in the hearing on the motion for summary judgment. When questioned, Hill's counsel clarified that "our position is that it comes down to the fact that the grass had grown over the particular roots that tripped Hill," and emphasized that "if the grass was not covering the roots, there wouldn't be a duty." Nowhere did counsel ever assert the (contrary) point pressed on appeal-that a duty arose from the affirmative creation of harm by Superior's negligent mowing of the tree shoots over the years.
1946 Hill accordingly failed to preserve the "affirmative creation of harm" theory she advances on appeal. The general invocation of a theory is insufficient. See 438 Main St. v. Easy Heat, Inc., 2004 UT 72, ¶ 51, 99 P.3d 801 (to be preserved, an issue must be (1) "raised in a timely fashion," (2) be "specifically raised," and (8) the "challenging party must introduce supporting evidence or relevant legal authority" (internal quotation marks omitted)). Preservation requires affording the district court a meaningful opportunity to rule on the ground that is advanced on appeal, and that implies, at a minimum, not just the invocation of a legal principle but also its application to the facts of the case. See Allen v. Friel, 2008 UT 56 ¶ 9, 194 P.3d 903 (explaining, in the analogous context of our rules regarding adequate briefing on appeal, that we have "repeatedly noted that a brief is inadequate if it merely contains bald citations to authority [without] development of that authority and reasoned analysis based on that authority" (alteration *1064 in original, internal quotation marks omitted); Tolman v. Winchester Hills Water Co., 912 P.2d 457, 461 (Utah Ct.App.1996) (holding that "[the mere mention of an issue without introducing supporting evidence or relevant legal authority does not preserve that issue for appeal" (internal quotation marks omitted)).
T47 Our adversary system demands at least that much. Our judges cannot be expected to accept the parties' theories as an invitation to root around in the record to see if they might apply. Like an appellate court, a district court "is not a depository in which [a party] may dump the burden of argument and research." Allen, 2008 UT 56, ¶ 9, 194 P.3d 903 (alteration in original, internal quotation marks omitted). And we cannot accordingly reverse them for failing to undertake that task.
48 Hill's theory fails on that basis. She did make general reference to a duty arising from affirmative creation of harm, but she never identified a basis for applying that theory to the facts of this case. Her argument instead had only to do with Superior's knowledge and omissions, which of course have nothing to do with affirmative creation of harm.
149 The record citations relied on by the dissent are not to the contrary. It is true that Hill's declaration asserts that she "observed that there were rigid 'stumps' or clumps of sticks that appeared to have resulted from [Superior] repeatedly mowing down new shoots." And that assertion was also repeated in Hill's summary judgment brief. But the brief makes this point only in the background statement of facts. It nowhere repeats it in the argument section-and certainly not as the basis for imposing a duty arising from the affirmative creation of harm.
150 The dissent's contrary conclusion is based on the portion of Hill's summary judgment brief that asserts that "(bly virtue of its deficient ... maintenance ... Superior cere-ated a more dangerous situation than what existed previously." Infra ¶ 61. But the quoted sentence itself makes no mention of any affirmative act creating any harm. This is accordingly just a repetition of the general theory. And this invocation of the theory follows immediately after the full paragraph quoted above (which is the only part of the brief that makes any effort to extend this theory to the facts of the case). Again, however, that paragraph makes no mention of any affirmative acts; it focuses only on Superior's knowledge and omissions. So in context, the assertion of a duty arising out of Superior's affirmative "maintenance" is insufficient, as the only deficient maintenance cited in the brief was that it "failed to remove the roots, and failed to trim the grass such that it grew so long that it fully obscured the rigid tree roots below."
T51 The dissent also cites Hill's supplemental brief on summary judgment, asserting that there "Hill argued that she 'believed the sticks to be the remnants of tree growths or 'suckers' that resulted from repeated mowing and other attempted maintenance by [Superior]." Infra ¶ 61. But the quoted statement is not argument; it is from the fact section of the brief. And in any event the supplement brief had nothing to do with the question of duty; it dealt only with whether tree shoots were an "unreasonably dangerous condition" and whether that question was one for the jury.
1 52 The problem with Hill's assertion of a duty arising from "affirmative creation of harm" is not that it was not "emphasized." Infra ¶ 62. It is that it was not presented- or at least not presented in a way that gave the district court a meaningful opportunity to rule on it. Perhaps the court could have gone out of its way to connect the dots from Hill's declaration to her later assertion of a theory of a duty arising from the affirmative creation of harm. But we cannot fault the court for not performing that responsibility, which in our adversary system fell ultimately on Hill.
1 53 Thus, in the district court Hill focused on Superior's omissions, not its affirmative conduct. So the theory of affirmative cere-ation of harm due to repeated mowing over fourteen years is not properly before us, as Hill never afforded the district court an "opportunity to rule on the issue." Kell v. State, 2012 UT 25, ¶ 11, 285 P.3d 1133.
*1065 [ 54 We accordingly decline to reach this issue. And, having rejected all of Hill's grounds for imposing a duty on Superior, we affirm the entry of summary judgment in its favor.
Justice LEE authored the opinion of the Court, in which Chief Justice DURRANT and Associate Chief Justice NEHRING joined.
Justice PARRISH filed an opinion concurring in part and dissenting in part, in which Justice DURHAM joined.

. The facts as stated here are in the light most favorable to Hill, as the nonmoving party on summary judgment.

. Several days after the accident, the common area where Ms. Hill had fallen was blocked off with caution tape and rebar. It is unclear who blocked off the area. Later on, the tree was removed altogether, though again it is unclear who removed it.

. See, e.g., Beck v. Farmers Ins. Exch., 701 P.2d 795, 800 & n. 3 (Utah 1985) (holding "that in a first-party relationship between an insurer and its insured, the duties and obligations of the parties are contractual rather than fiduciary" and that "[wiithout more, a breach of those implied or express duties can give rise only to a cause of action in contract, not one in tort," but further noting that some "acts constituting a breach of contract may also result in breaches of duty that are independent of the contract and may give rise to causes of action in tort"); DCR Inc. v. Peak Alarm Co., 663 P.2d 433, 435-36 (Utah 1983) (explaining that tort and contractual duties are distinct and that tort lability does not necessarily follow directly from a contractual breach, although a contractual relationship may give rise to a relationship on which a tort duty is premised); see also Esty v. Beal Bank S.S.B., 298 S.W.3d 280, 301 (Tex.App.2009) ("Although a party's actions may breach duties in tort, contract, or both, Texas Jurisprudence has long recognized that mere nonfeasance under a contract creates liability only for breach of contract." (internal quotation marks omitted)); Mesmer v. Md. Auto. Ins. Fund, 353 Md. 241, 725 A.2d 1053, 1058 (1999) ("Mere failure to perform a contractual duty, without more, is not an' actionable tort." (internal quotation marks omitted)); Chamberlaine & Flowers, Inc. v. Smith Contracting, Inc., 176 W.Va. 39, 341 S.E.2d 414, 417 (1986) ("[There is generally no tort liability for failing to do what one has contracted to do, unless there is some duty to act apart from the contract."); Morgan v. S. Cent. Bell Tel. Co., 466 So.2d 107, 114 (Ala.1985) ('There is, in Alabama, no tort liability for nonfeasance for failing to do what one has promised to do in the absence of a duty to act apart from the promise made. On the other hand, misfeasance, or negligent affirmative conduct in the performance of a promise generally subjects an actor to tort liability as well as contract liability for physical harm to persons and tangible things.").

. See Peterson v. Sevier Valley Canal Co., 107 Utah 45, 151 P.2d 477, 479 (1944) (interpreting a contractual provision in light of the parties' "course of conduct"); see also Restatement (Sze onp) or Contracts § 202(4) (1981) (explaining that "any course of performance accepted or acquiesced in without objection is given great weight in the interpretation" of a contract).

. - See also Random House Dictionary of the English Language 253 (2d ed.1987) (defining "branch" as a "division or subdivision of the stem or axis of a tree"); The American Heritage Dictionary of the English Language 223 (5th ed.2011) (defining "branch" as a "secondary woody stem or limb growing from the trunk or main stem of a tree ... or from another secondary limb").

. - See Webster's Third New International Dictionary 2235 (3d ed.1961) (defining "stem" as "the main and usu[ally] wholly or predominantly aerial axis, trunk, or body of a tree or other plant").

. See Higgins v. Salt Lake Cnty., 855 P.2d 231, 237 (Utah 1993). ("Determining whether the actor has a duty to prevent another's harm requires careful consideration of the consequences of imposing that duty ... for society."); Robinson v. Tripco Inv., Inc., 2000 UT App 200, ¶ 40, 21 P.3d 219 ("'The law of torts is based on the principle of compensation of individuals for injuries sustained as a result of the unreasonable conduct of another. Tort law also serves the purpose of preventing future harm." (internal quotation marks omitted)).

. Courts in other jurisdictions have also emphasized this factor. See, e.g., Downs v. A & H Constr. Ltd., 481 N.W.2d 520, 523 (Iowa 1992) (addressing the issue of whether a general contractor retained "sufficient control over" a building project to owe possessor duties to the employee of a subcontractor); see also McDevitt v. Sportsman's Warehouse, Inc., 151 Idaho 280, 255 P.3d 1166, 1171 (2011) (concluding that defendant could not be liable because it lacked control); Rhodes v. Wright, 805 N.E.2d 382, 385 (Ind.2004) ("In premises liability cases, whether a duty is owed depends primarily upon whether the defendant was in control of the premises when the accident occurred.").

. See O'Connell v. Turner Constr. Co., 409 IIl.App.3d 819, 351 Ill.Dec. 10, 949 N.E.2d 1105, 1109-10 (2011) (explaining that a prerequisite to premises liability is that "defendant be a possessor of land" and affirming summary judgment in favor of a defendant because the facts did not show that the defendant exercised "exclusive control" or "dominion" over the property since he could not, for example, "exclude anyone from the premises" (internal quotation marks omitted); Hoffner v. Lanctoe, 290 Mich.App. 449, 802 N.W.2d 648, 651-52 (2010) (defining a possessor as one who "may exercise control over something to the exclusion of all others," and reversing denial of summary judgment for a defendant who lacked the requisite degree of control (internal quotation marks omitted)), rev'd in part on other grounds, 492 Mich. 450, 821 N.W.2d 88 (2012); Thayer v. James Whitcomb Riley Festival Ass'n, 802 N.E.2d 7, 11-13 (Ind.Ct.App.2003) (relying in part on the fact that defendant did not have the ability to exclude others from the property in concluding that it was not a possessor").

. See O'Connell, 351 Ill.Dec. 10, 949 N.E.2d at 1109-10 (affirming summary judgment in favor of a defendant because the facts did not show *1060 that the defendant exercised "exclusive control" or "dominion" over the property since he could not, for example, "alter what was built where" and merely had "overall responsibility for grounds and site conditions" (internal quotation marks omitted)); Gragg v. Wichita State Univ., 261 Kan. 1037, 934 P.2d 121, 131 (1997) (affirming summary judgment for defendants because they lacked "authority to implement different security measures" or "any ability to remedy [the] danger"); Harris, 759 N.E.2d at 225 ("[Olnly the party who controls the land can remedy the hazardous conditions which exist upon it....") (alteration in original, internal quotation marks omitted).

. See Pratt v. Mitchell Hollow Irrigation Co., 813 P.2d 1169, 1172 (Utah 1991) ("Generally, a landowner owes no duty to a trespasser, except to refrain from causing willful and wanton injury to him or her." (internal quotation marks omitted)).

. See, e.g., English v. Kienke, 848 P.2d 153, 156 (Utah 1993) (setting forth the duties owed to an invitee); Schlueter v. Summit Cnty., 25 Utah 2d 257, 480 P.2d 140, 141-42 (1971) (setting forth duties owed to a licensee); see also, generally, Whipple v. Am. Fork Irrigation Co., 910 P.2d 1218, 1220 (Utah 1996) ("'This court has often recognized that the duty owed by a possessor of land to another person depends on whether that person is an invitee, a licensee, or a trespasser.").

. See Kay v. Danbar, Inc., 132 P.3d 262, 272 (Alaska 2006) (declining to impose liability pursuant to section 387 because of "doubt that the evidence could reasonably support a finding that RE/MAX undertook complete control and responsibility for the Tanner brothers' duplex, so as to make it responsible for curing major structural defects"); Virgin v. McDonald's Rest., No. Civ. A. 5:04 CV208R, 2005 WL 2123535, at *2 (W.D.Ky. Sept. 2, 2005) (granting a defendant's motion for summary judgment because the plaintiff, whose action was premised on section 387 of the Restatement, had failed to show that the "entire charge" of the property had been turned over to the defendant); Cont'l Paper & Supply Co. v. City of Detroit, 451 Mich. 162, 545 N.W.2d 657, 659 (1996) (explaining that the level of control required by section 387 is "absolute control").

. See, e.g., Taylor v. Duke, 713 N.E.2d 877, 881 (Ind.Ct.App.1999) (affirming summary judgment for a trucking company that had run over a homeless teenage boy because the trucking company had been acting on behalf of the possessor of the premises and owed the boy, a trespasser, only a minimal duty-'"to refrain from wantonly or willfully injuring him after discovering his presence").

. Hill also points to the activity Superior allegedly undertook following her accident (in allegedly cordoning off the common area with caution tape and in ultimately removing the tree). But these postaccident activities have no bearing on the question whether Superior voluntarily undertook a duty, as Ms. Hill obviously does not argue that she was injured as a result of Superior's deficient performance of these activities, or that she was somehow harmed by relying on its undertaking of these acts.

. See Taylor v. Bi-Cnty. Health Dep't, 353 Ill. Dec. 857, 956 N.E.2d 985, 996-97 (Ill.App.Ct.2011) (rejecting a plaintiff's invocation of the voluntary undertaking theory because "the duty of care to be imposed upon a defendant is limited to the extent of its undertaking" and even though the defendant "undertook to provide [the plaintiff} with childhood vaccinations, the extent of its undertaking was only to do so in accordance with its discretionary policies," which were appropriately followed in declining to provide the vaccine (internal quotation marks omitted)).

. Weber ex rel. Weber v. Springville City, 725 P.2d 1360, 1364 (Utah 1986) (explaining that while Utah "has recognized that one who undertakes to render services has a duty to exercise reasonable care," the "nature of this rule requires the Court to narrowly construe the scope of any assumed duty").

. The argument in her brief is as follows: "The evidence shows that Ms. Hill was tripped by a cluster of rigid tree growths that were hidden underneath lengthy grass. The stiff groupings of roots were not a natural condition that Superior merely passively failed to remove. To the contrary, they were the byproduct of years of Superi- or's improper maintenance, which included cutting down the growths such that they became hard, shaven, and nubby."